**Anna I. WOODWORTH et al.,**
Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 12158.

United States Court of Appeals,
Sixth Circuit.

Jan. 27, 1955.

L. F. Loux, Cleveland, Ohio (Orgill, Klein, Loux & Wickham, Cleveland, Ohio, on the brief), for petitioners.

S. Dee Hanson, Washington, D. C. (H. Brian Holland, Ellis N. Slack, Lee A. Jackson and L. W. Post, Washington, D. C., on the brief), for respondent.

Before SIMONS, Chief Judge, and MARTIN and STEWART, Circuit Judges.

STEWART, Circuit Judge.

The question here is whether the petitioners realized the equivalent of a taxable dividend in 1945 upon cancellation by a corporation of shares of stock standing in their names coincident with cancellation of their notes payable to the corporation. The Commissioner determined that the surrounding circumstances brought the transaction within the reach of § 115(g) of the Internal Revenue Code then in effect,[1] and assessed deficiencies. The Tax Court sustained the Commissioner, and the petitioners sought review here.

The controversy grows out of the acquisition of control of The Buckeye Stamping Company, hereinafter called "Buckeye," by a purchasing syndicate in 1943. The petitioners were members or are successors in interest to members of the syndicate.

Buckeye, an Ohio corporation, was organized prior to 1913. Its capital structure at the time of organization consisted of two hundred shares of common stock, issued at a par value of $100 per share. By 1943, as a result of two stock dividends and the transfer by the corporation of $180,000 from its earned surplus to its capital account, there were two thousand outstanding shares of $100 par stock. Earle C. Derby and his wife, Lillie G. Derby, together owned eighteen hundred shares; ownership of the remaining two hundred shares was distributed among five different persons.

Early in 1943 Earle C. Derby died, leaving his widow, personally and as executrix, in control of ninety per cent of Buckeye's outstanding shares. At that time Buckeye had substantial accumulated earnings, represented largely by government bonds and other marketable securities. Mrs. Derby, of advanced age and with no experience or training to conduct the affairs of the corporation she thus controlled, embarked upon negotiations for the disposition of her interest in Buckeye almost immediately upon her appointment as executrix.

These negotiations reached fruition on September 4, 1943, when Mrs. Derby executed a written agreement with the members of a purchasing syndicate, including petitioners or their predecessors, for the sale of her eighteen hundred shares of stock in Buckeye at $170 per share. The agreement recited a down payment of $5,000, and provided that delivery of the shares would be made to the syndicate members or their nominees on or before October 15, 1953, upon payment to Mrs. Derby of the balance of the $306,000 purchase price. The agreement further provided that prior to the consummation of the sale, Mrs. Derby and her attorney would resign as di-

---

1. "If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend." 26 U.S.C.A. § 115(g).

rectors of Buckeye, and that meanwhile the assets of Buckeye would not be depleted by the declaration of dividends or otherwise than in the normal operation of the business. Under the agreement, Mrs. Derby undertook to persuade the owners of the remaining two hundred shares to sell them to the syndicate at the same price of $170 per share.

One week later the minority stockholders did sell their shares to the syndicate members for $170 per share, payment being made by cashier's check. Two days thereafter, on September 13, Mrs. Derby and her attorney did resign as directors of Buckeye.

Four days later, on September 17, a rather bewildering series of events took place. First, a new Board of Directors was elected, consisting principally of syndicate members. The minutes of the first meeting of the new Board on that day contain resolutions ratifying the purchase of Mrs. Derby's eighteen hundred shares *by Buckeye* at $170 per share and authorizing said shares to be held as treasury shares. Another resolution ratified the sale of Buckeye's securities and other assets to pay for Mrs. Derby's stock. These corporate assets were delivered the same day to a bank, which issued a cashier's check for $175,-000, payable to Buckeye. The check was endorsed by Buckeye to Mrs. Derby and was delivered to and cashed by her on the same day. Also on the same day two other cashier's checks for the balance of the purchase price were delivered to Mrs. Derby. These apparently represented the balance of Buckeye's quick assets, plus two loans to Buckeye totalling $95,000. After Mrs. Derby was paid for her eighteen hundred shares, the certificates therefor were surrendered to Buckeye and cancelled. Also on the same day the syndicate members executed and delivered their personal notes in varying amounts to Buckeye, in the total amount of $340,000, equal to the purchase price of the two thousand previously outstanding shares.

Some days later Buckeye issued certificates for two thousand shares in the names of the syndicate members, the number of shares to each member being proportionate to the amount of the note each had executed at the rate of $170 per share. These stock certificates were never delivered to the syndicate members, but were held by Buckeye as security for payment of the notes.

The syndicate members or their successors in interest reduced their note obligations at various times from September, 1943, to the end of 1945. In the latter part of 1945 Buckeye's counsel advised the company that in his opinion the issuance of stock for notes was illegal under the laws of Ohio. Acting on this advice, the syndicate members surrendered seventy-five per cent of the number of shares standing in their respective names, and received credit on their notes at the rate of $170 per share. This resulted in cancellation of the note obligations held by the company, after certain small cash adjustments, and the retention by petitioners of their proportionate ownership of Buckeye stock.

In the light of the foregoing circumstances, the Commissioner determined that the cancellation of $255,000 in notes and equivalent cancellation of stock on December 31, 1945, resulted in a taxable dividend to the shareholders in that year to the extent of Buckeye's post February 28, 1913, accumulated earnings, and assessed deficiencies against the petitioners accordingly.

In sustaining the Commissioner's position, the Tax Court found as a fact that Mrs. Derby sold her stock not to Buckeye but to the syndicate members in accordance with the written agreement of September 4, 1943. The court found that the syndicate members had, in effect, borrowed the funds from Buckeye with which to purchase Mrs. Derby's stock in 1943. When in 1945 their notes to the corporation and the corporation's shares held as security therefor were cancelled, the court pointed out that no change was effected in the relative position of the stockholders to the corporation. Upon these factual findings, the court concluded in a closely reasoned

opinion that the Commissioner had correctly determined that the cancellation of the notes was essentially the equivalent of a dividend taxable to the petitioners in 1945.

On this review petitioners vigorously urge that the Tax Court's factual findings are clearly erroneous. They say that the written agreement of September 4 was superseded by "other and different agreements," and that in the actual transaction as carried out Mrs. Derby caused Buckeye's accumulated earnings represented by its liquid assets to be paid over to her, leaving Buckeye only its operating assets before the syndicate members acquired control of the company.

To support their contention that the written agreement of September 4 was superseded, they point out that whereas that agreement recites payment of the initial installment of $5,000, the $5,000 payment was not actually made until six days later. Furthermore, they point to the Directors' minutes of September 17, 1943, which recite that Mrs. Derby had sold her shares to Buckeye and which show ratification of such a sale. Finally, they emphasize that the undisputed evidence shows that the only interest of the syndicate was in acquiring control of Buckeye's physical assets and that they had no interest whatever in acquiring Buckeye's portfolio of securities.

Petitioners say that their subsequent execution of notes payable to Buckeye for stock certificates issued in their names was an independent transaction amounting to nothing more than an agreement to purchase stock from the company, which was rescinded by mutual consent in 1945. They say that some shares were purchased under this agreement as payments were made on the notes from 1943 to 1945. They emphasize that it was only because counsel advised the company in 1945 that the purported issuance of stock in return for notes was illegal under Ohio law, that the company in that year cancelled all stock for which payment in full had not

been received, and returned all unpaid notes to the syndicate members. They insist that in view of these circumstances there was no "distribution," no "redemption," and indeed no earnings or profits to distribute since these had been paid to Mrs. Derby in 1943, and that § 115(g) of the Internal Revenue Code can therefore have no application.

The petitioners further contend that, since under the Ohio law a corporation may not accept promissory notes in payment for shares, the purported stock certificates and notes were a nullity, and therefore no valid shares were cancelled and no valid notes released. Ohio General Code § 8623–22; cf. Ohio Revised Code § 1701.26; see State ex rel. Cullitan v. Stookey, Cuyahoga County 1953, 95 Ohio App. 97, 113 N.E.2d 254. This contention would, of course, have bearing only if we should reject the Tax Court's finding that the syndicate members purchased their shares from Mrs. Derby.

■■ The petitioners' arguments are not without force. We are unable, however, to hold clearly erroneous the Tax Court's finding that the terms under which Mrs. Derby parted with her stock in 1943 were those contained in the written agreement of September 4, providing for the sale of her stock to petitioners, not to Buckeye. Despite the inconsistencies emphasized by petitioners, most of the facts of record sustain the view that what was done was done pursuant to the September 4 agreement. That agreement provided that Mrs. Derby was to transfer her shares to the syndicate members *or their nominees,* and her subsequent transfer of them to Buckeye is, therefore, not necessarily so inconsistent as at first blush would appear. Moreover, Buckeye's books and records are consistent with the Tax Court's finding and inconsistent with the theory advanced by petitioners. Buckeye's books continued during the remainder of 1943 and throughout 1944 to show its outstanding stock as two thousand shares of a par value of $100 each. Buckeye never recorded or carried on its

books as treasury stock the eighteen hundred shares in question. The balance sheet showed a surplus at the end of 1943 comparable to that of the prior year. Book entries are, of course, not conclusive, but they are evidential. Doyle v. Mitchell Brothers Co., 1918, 247 U.S. 179, 187, 38 S.Ct. 467, 62 L.Ed. 1054. Other corroborating evidence is reviewed in the Tax Court's opinion and need not be repeated here.

The here pertinent language of § 115 (g) has been in the revenue statutes since 1926, and over the years the courts have searched for some sure touchstone that would tell when it is that a distribution in partial redemption is "essentially equivalent" to the payment of a dividend. The search has been in vain.

It was once widely supposed that in order to invoke the statute an intent to avoid taxes had to be shown. Patty v. Helvering, 2 Cir., 1938, 98 F.2d 717; Commissioner of Internal Revenue v. Cordingley, 1 Cir., 1935, 78 F.2d 118. It was thought that a legitimate business purpose for the partial redemption was enough to avoid the inpact of the statute's provisions. Bona Allen, Jr., 1940, 41 B.T.A. 206; Commissioner of Internal Revenue v. Champion, 6 Cir., 1935, 78 F.2d 513.

Then, in the light of the Supreme Court's opinion in Commissioner of Internal Revenue v. Bedford's Estate, 1945, 325 U.S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611, the pendulum swung the other way, and it was even suggested that the only test might be the mere existence of earnings and profits. Kirschenbaum v. Commissioner, 2 Cir., 1946, 155 F.2d 23, 170 A.L.R. 1389. As soon perceived, however, the question could not be so simply resolved. For if Section 115(c) prescribing capital gain treatment for re-demption of stock in partial liquidation is to have any application, not all stock redemption cases can be disposed of by simple reference to the availability of earnings and profits. Commissioner of Internal Revenue v. Snite, 7 Cir., 1949, 177 F.2d 819.

In Flanagan v. Helvering, 1940, 73 App.D.C. 46, 116 F.2d 937, 939, 940, Judge (later Chief Justice) Vinson wrote that it is the "net effect of the distribution rather than the motives and plans of the taxpayer or his corporation," that is "the fundamental question in administering § 115(g)." Yet it has been said that "the net-effect test is not a test but an attractive abbreviation of the statute * * *. 'Net effect' is a paraphrase for 'essentially equivalent.'" Commissioner of Internal Revenue v. Sullivan, 5 Cir., 1954, 210 F.2d 607, 609.

So the decided cases in the end only lead back to the door at which we entered, the statute itself, which imposes an ordinary income tax upon a partial liquidation only when made "at such time" and "in such manner" as to make the distribution and cancellation essentially equivalent to the distribution of a dividend.[2]

Accepting as we do the Tax Court's finding that the syndicate members borrowed funds from Buckeye in 1943 to purchase Mrs. Derby's shares, and that Buckeye forgave the remaining balance of this loan in 1945, the court's ultimate finding that the 1945 transaction was substantially equivalent to a dividend distribution would seem logically to follow. Lowenthal v. Commissioner, 7 Cir., 1948, 169 F.2d 694; Wall v. United States, 4 Cir., 1947, 164 F.2d 462; J. Natwick, 1937, 36 B.T.A. 866. Compare Fox v. Harrison, 7 Cir., 1944, 145 F.2d 521.

**2.** "No rule of construction applicable alike in all cases can be accepted, but each case presents questions of fact to be determined in the light of all the surrounding circumstances, and whether a given case falls within or without * * * section 115(g) is often a difficult question and one inviting the closest scrutiny of the trier of the facts." McGuire v. Commissioner, 7 Cir., 1936, 84 F.2d 431, 432. Cf. Treasury Regulations 111, Sec. 29.115–9 "The question * * * depends upon the circumstances of each case."

**724**

It is true that the syndicate members could have achieved their objective, yet completely avoided the tax liability here imposed, simply by their purchase of the two hundred shares owned by the minority shareholders, followed by Buckeye's redemption of all Mrs. Derby's stock. We can assume that if the transaction had been cast in that form neither petitioners nor Mrs. Derby would have been charged with the receipt of ordinary income. Cf. Zenz v. Quinlivan, 6 Cir., 1954, 213 F.2d 914.

That being so, it can be argued that to permit the decision of the Tax Court to stand is to permit form to triumph over substance. Yet, to the extent here implied, it is form which often must prevail, when the delicate question involved is whether the extraction of a corporation's earned surplus has been accomplished at less than the rates taxed upon ordinary income. Cf. Chamberlin v. Commissioner, 6 Cir., 1953, 207 F.2d 462. "If a taxpayer has two legal methods by which he may attain a desired result, the method pursued is determinative for tax purposes without regard to the fact that different tax results would have attached if the alternative procedure had been followed." Woodruff v. Commissioner, 5 Cir., 1942, 131 F.2d 429, 430. Indeed the statute directs that the "manner" of the transaction be a controlling factor.

The Tax Court's finding of substantial equivalence to a dividend, although decisive of the sole ultimate issue, remains a finding of fact. Commissioner of Internal Revenue v. Champion, supra; Lowenthal v. Commissioner, supra; McGuire v. Commissioner, supra; Kirschenbaum v. Commissioner, supra. In view of the court's finding as to the "manner" of the transaction, and of the retention by petitioners of undiminished fractional interests in Buckeye after all was over, we cannot conclude that the Tax Court's disposition of the ultimate issue was clearly erroneous.

Its decision is therefore affirmed.