TELEVISION INDUSTRIES, INC., TRANSFEREE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67319. Filed September 28, 1959.

*Henry W. de Kosmian, Esq.*, and *George S. Parlin, Jr., Esq.*, for the petitioner.

*Scott A. Dahlquist, Esq.*, for the respondent.

### OPINION.

ATKINS, *Judge:* The respondent determined that the petitioner was liable, as transferee, for deficiencies in income taxes and interest due from the transferor, National Phoenix Industries, Inc., totaling $71,717.42 for the year 1951 and $77,199.53 for 1953. By stipulation the respondent has now conceded that assessment against petitioner, as transferee, of any income tax deficiency of the transferor for 1951 is barred by the statute of limitations. However, there remains the question whether in 1951 the transferor received a distribution es-

sentially equivalent to a dividend in the amount of $1,026,285 on the sale by it of 260 shares of stock of Nedick's, Inc., to the issuing corporation. Decision of this issue affects the tax liability for 1953 inasmuch as it is stipulated that if such transaction did not result in any income to the transferor there would be a net operating loss deduction of $147,384.74 in 1953, which would eliminate any tax liability of the transferor for that year.

The facts were stipulated and are incorporated herein by this reference.

The petitioner is a corporation, incorporated under the laws of Delaware, with its principal office at Englewood, New Jersey. At the time of the filing of the petition its name was C & C Super Corporation.

On April 29, 1954, the petitioner acquired all the assets and assumed all the liabilities of National Phoenix Industries, Inc. (hereinafter called Phoenix or the transferor). Phoenix had been incorporated under the laws of Delaware on December 21, 1950, under the name of Phoenix Industries Corporation. On November 8, 1951, National Power & Light (hereinafter called N.P. & L.) was merged into Phoenix and the name was changed to National Phoenix Industries, Inc. Its principal office is in New York City.

Phoenix, for the years 1951 through 1953, operated upon a calendar year basis and employed an accrual method of accounting in keeping its books and filing its returns. Its Federal income tax returns for the years 1951 and 1953 were filed with the collector of internal revenue for the second district of New York and with the district director of internal revenue for the Lower Manhattan District of New York, respectively.

At a meeting of the board of directors of Phoenix held on May 14, 1951, Walter S. Mack, the president, stated that he had for some time been negotiating with partners of Wertheim & Company for the purchase of 900 of the 1,000 shares of the outstanding common stock of Nedick's, Inc.; that the proposed agreement provided for a purchase price of $3,600,000 payable as follows: $200,000 at the time of signing the agreement; $500,000 60 days later; and $2,900,000 6 months after the initial payment; that Nedick's, Inc., had on hand as of December 31, 1950, approximately $940,000 in cash and Government securities and that in the 6 months' purchasing period it should liquidate a sizable amount of its $1 million inventory, which would also be available in cash, and that, in addition thereto, most of the earnings of the year would have been earned by the time of the final payment; that therefore he felt that at least $1 million would be available in Nedick's, Inc., itself to be applied toward the purchase price; and that Nedick's, Inc., had options to purchase the remaining

10 per cent of its stock from the employees who owned it at approximately the same price at which Phoenix would purchase the 90 per cent.

On May 21, 1951, Phoenix, pursuant to authorization given at the meeting of May 14, entered into an agreement with the estate of Maurice Wertheim and others (hereinafter called the sellers) by which it purchased 900 shares of the common stock of Nedick's, Inc., for $3,600,000, payable as follows: $200,000 at time of the agreement; $500,000 60 days thereafter; and $2,900,000 180 days after the agreement; with interest on the deferred amounts at 3 per cent per annum. It was provided that simultaneously with the execution and delivery of the agreement the certificates for all the shares, duly endorsed in blank, should be delivered by the sellers to Phoenix and deposited by Phoenix in escrow with the Irving Trust Company; that upon the execution and delivery of the agreement and payment of the downpayment on the purchase price, title to the stock should forthwith pass to Phoenix which should thereupon be entitled to have the stock registered in its name; but that if registered in its name prior to payment of the second installment Phoenix should execute and deliver to the sellers suitable powers of attorney or proxies to enable the sellers to vote the stock until the payment of the second installment; that until payment of the second installment the sellers should possess all voting powers of the stock and Phoenix should have no right to participate in the management; that during the period between the second and final installments Phoenix would be entitled to exercise all voting powers and the sellers should have no right to participate in management, but that during that period Phoenix would not permit Nedick's, Inc., to pay any dividend or make any other distribution upon the stock. It was further provided that Phoenix might assign its rights under the contract provided the assignee assumed the liabilities of Phoenix under the contract, but that the assignment and assumption should not operate to relieve Phoenix of its liability to pay, or cause to be paid, the full purchase price.

Phoenix paid the first installment of $200,000 on May 21, 1951, and the 900 shares of common stock of Nedick's, Inc., were registered in the name of Phoenix and deposited in escrow with Irving Trust Company.

On July 9, 1951, Phoenix acquired 46½ per cent of the common stock of N.P. & L. On July 18, 1951, Phoenix assigned to N.P. & L. its rights in the 900 shares of stock of Nedick's, Inc., and its rights under the purchase and escrow agreements, in exchange for $200,000, the reimbursement of its out-of-pocket expenses relating to the acquisition of the 900 shares ($7,527), and the assumption by N.P. & L. of the obligation to make the installment payments.

On July 20, 1951, N.P. & L. paid $500,000 to the sellers as the second installment on the purchase agreement.

On August 2, 1951, Nedick's, Inc., purchased 50 shares of its common stock owned by George Hanby, its president, for an aggregate price of $200,000, or $4,000 per share. This purchase was made pursuant to an option granted to Nedick's, Inc., on August 31, 1948.

On November 8, 1951, as part of the merger of N.P. & L. into Phoenix, N.P. & L. executed a bill of sale and assignment transferring all its assets, including the common stock of Nedicks', Inc., and the rights under the purchase and escrow agreements to Phoenix.

As the result of negotiations with the sellers, the aggregate purchase price of the 900 shares of stock of Nedick's, Inc., was reduced from $3,600,000, plus interest, to $3,545,000, without interest.

On November 15, 1951, Phoenix borrowed $1 million from the Marine Midland Trust Company of New York on a clearance loan for the purpose of paying the final installment, as reduced, due under the purchase agreement.

On November 15, 1951, Phoenix paid the final installment of the purchase price in the reduced amount of $2,845,000 and the 900 shares of common stock of Nedick's, Inc., were delivered to Phoenix. On the same day Phoenix sold 260 shares of the common stock of Nedick's, Inc., to Nedick's, Inc., for $3,947.25 per share, or an aggregate of $1,026,285, which was the same amount as the cost of such shares to Phoenix. Of this amount, $1 million was used by Phoenix to repay, on November 15, 1951, the clearance loan obtained from the Marine Midland Trust Company. Nedick's, Inc., held these 260 shares of its stock as treasury stock until Nedick's, Inc., was merged into the petitioner on May 28, 1954.

On December 14, 1951, Phoenix acquired 41 shares of common stock of Nedick's, Inc., at a price of $4,110 per share, which was paid in cash in the amount of $42,127.50 and by the issuance of 50,553 shares of common stock of Phoenix. On the same date Phoenix also acquired 9 additional shares of common stock of Nedick's, Inc., in exchange for 14,211 shares of common stock of Phoenix. On December 14, 1951, Nedick's, Inc., held options to purchase these 50 shares.

The consolidated balance sheet and the consolidated statement of income and earned surplus of Nedick's, Inc., and its subsidiaries as of December 31, 1950, showed cash of $478,397.56, Government securities and interest of $337,194, merchandise inventories of $1,029,725.03, notes and accounts receivable of $97,839, or total current assets of $1,943,155.59; and earned surplus of $3,265,989.98. As of December 31, 1951, they showed cash of $459,342, accounts and other receivables of $46,897, claim for refund of taxes of $12,759, inventories at $506,-350, or total current assets of $1,025,348; and earned surplus of $3,365,831.

In its 1951 Federal income tax return Phoenix reported the purchase of 260 shares of stock of Nedick's, Inc., on November 8, 1951, at a cost of $1,026,285 and a sale of the same shares at the same price on November 15, 1951, and, therefore, showed no gain or loss therefrom.

In the notice to the petitioner of its liability as transferee of assets of Phoenix, the respondent determined that there was a deficiency in Phoenix' income tax of $63,618.75 for 1951 and $108,539.79 for 1953, plus interest. For 1951 he made certain adjustments, including an increase of reported income of $1,026,285 as a dividend, resulting in corrected net income of $907,963.86 instead of a net loss of $167,328.37 as reported by Phoenix on its return. The respondent stated that the sale of the 260 shares of Nedick's, Inc., stock was in fact a redemption by Nedick's, Inc., of its stock essentially equivalent to the distribution of a taxable dividend. For 1953 the respondent disallowed certain claimed items, including a net operating loss deduction of $181,128.91, and determined that Phoenix had corrected net income of $285,645.87 instead of $86,758.56 as reported.

Section 115 (g) of the Internal Revenue Code of 1939 provides:

If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

The petitioner contends that all the foregoing steps were parts of an integrated transaction; that from the beginning it was intended that Nedick's, Inc., could and would purchase 260 shares of its outstanding stock for approximately $1 million; and that the net effect was that on November 15, 1951, Phoenix acquired 640 shares of Nedick's, Inc., stock for $1,818,715, plus $700,000 previously paid by it, or an aggregate of $2,518,715. It emphasizes its position by stating that Phoenix started out by owning no stock of a corporation worth approximately $3,600,000 and that it ended up owning 640 shares (approximately 92 per cent) of a corporation worth approximately $2,600,000, for which it had paid that amount. It states that had the sellers sold 260 shares of Nedick's, Inc., stock directly to Nedick's and 640 shares to Phoenix, no dividend would have resulted to either the sellers or to Phoenix, citing *Zenz* v. *Quinlivan*, (C.A. 6, 1954) 213 F. 2d 914, reversing a District Court decision, and *Ray Edenfield*, 19 T.C. 13, and that this was the net effect of the transaction. Thus the petitioner contends that the cancellation or redemption of the 260 shares was not at such time and in such manner as to make the distribution essentially equivalent to the distribution of a taxable dividend.

It cites *Fox* v. *Harrison*, (C.A. 7, 1944) 145 F. 2d 521, affirming a District Court decision.

The respondent takes the contrary view, citing *Wall* v. *United States*, (C.A. 4, 1947) 164 F. 2d 462, affirming a District Court decision; *Lowenthal* v. *Commissioner*, (C.A. 7, 1948) 169 F. 2d 694, affirming a Memorandum Opinion of this Court; and *Woodworth* v. *Commissioner*, (C.A. 6, 1955) 218 F. 2d 719, affirming a Memorandum Opinion of this Court.

Although the transaction might have been cast in the form of a redemption by Nedick's, Inc., of some of the stock of the old stockholders and a sale of the remainder to Phoenix, resulting in no tax liability to Phoenix, it was not done in that way, and the form that the transaction took must prevail. The decision must be made upon the basis of what was actually done rather than upon what might have been done. *Wall* v. *United States, supra; Woodworth* v. *Commissioner, supra;* [1] *Woodruff* v. *Commissioner*, (C.A. 5, 1942) 131 F. 2d 429, affirming 46 B.T.A. 727; and *Thomas J. French*, 26 T.C. 263. And it has been held that the net effect of the distribution rather than the motives and plans of the taxpayer or his corporation is the fundamental question in administering section 115(g). *Flanagan* v. *Helvering*, (C.A.D.C.) 116 F. 2d 937, affirming a Memorandum Opinion of this Court.

Here Phoenix purchased the full 900 shares and was obligated under the contract for the full purchase price. From the beginning the transaction was one between Phoenix and the stockholders of Nedick's, Inc. Nedick's, Inc., itself, was not a party. From an examination of the stipulation of facts and all the documentary evidence, we find no indication whatever that there was any agreement between Nedick's, Inc., and the old stockholders to sell their stock to Nedick's. While it is true, as the petitioner contends, that Phoenix at all times had in mind to utilize cash of Nedick's, Inc., in the amount of approximately $1 million to consummate the transaction, there is no indication that it was to be used by Nedick's, Inc., in redemption of any of the stock

---

[1] In *Woodworth* v. *Commissioner*, (C.A. 6, 1955), 218 F. 2d 719, it was stated in part:

"It is true that the syndicate members could have achieved their objective, yet completely avoided the tax liability here imposed, simply by their purchase of the two hundred shares owned by the minority shareholders, followed by Buckeye's redemption of all Mrs. Derby's stock. We can assume that if the transaction had been cast in that form neither petitioners nor Mrs. Derby would have been charged with the receipt of ordinary income. Cf. *Zenz* v. *Quinlivan*, 6 Cir., 1954, 213 F. 2d 914.

"That being so, it can be argued that to permit the decision of the Tax Court to stand is to permit form to triumph over substance. Yet, to the extent here implied, it is form which often must prevail, when the delicate question involved is whether the extraction of a corporation's earned surplus has been accomplished at less than the rates taxed upon ordinary income. Cf. *Chamberlin* v. *Commissioner*, 6 Cir., 1953, 207 F. 2d 462. 'If a taxpayer has two legal methods by which he may attain a desired result, the method pursued is determinative for tax purposes without regard to the fact that different tax results would have attached if the alternative procedure had been followed.' *Woodruff* v. *Commissioner*, 5 Cir., 1942, 131 F. 2d 429, 430. Indeed the statute directs that the 'manner' of the transaction be a controlling factor."

from the old stockholders. There is no indication whatever that Phoenix, in causing Nedick's, Inc., to redeem 260 shares for $1,026,285, was acting as agent or intermediary for the old stockholders. At the time of redemption the petitioner owned all of the 900 shares which were the subject of the contract and was in control of the corporation. Certainly after the payment of the second installment on July 20, 1951, it could not be said that any of the substantial attributes of ownership remained in the old stockholders. True, the stock was in escrow, but that was no more than a security arrangement to protect the sellers. We think that the fact that there was a provision for liquidated damages in the agreement does not alter the conclusion that Phoenix was the owner of the stock. This provision was undoubtedly inserted to insure the completion of the payment of Phoenix' obligation to pay the remainder of the purchase price.

Under these circumstances, it is our conclusion, and we so find as an ultimate fact, that the redemption by Nedick's, Inc., of 260 of its shares was at such time and in such manner as to make the distribution of $1,026,285 essentially equivalent to the distribution of a taxable dividend to Phoenix in that amount. The facts here bring the instant case within the principles of *Wall* v. *United States, supra; Lowenthal* v. *Commissioner, supra; Woodworth* v. *Commissioner, supra;* and *Thomas J. French, supra.*

*Fox* v. *Harrison, supra*, is not determinative here. There the trial court had found that the taxpayer was acquiring the stock on behalf of the corporation and as a temporary expedient until such time as its finances would permit it to take the stock off of the taxpayer's hands. We cannot so find here. As stated, the documentary evidence clearly shows that the transaction was between the old stockholders and Phoenix, and no testimony was offered to show that the transaction was other than as indicated by the agreement and other documentary evidence. Nor is *Holsey* v. *Commissioner*, (C.A. 3) 258 F. 2d 865, reversing 28 T.C. 962, cited by the petitioner, in point. There the taxpayer had an option, but not an obligation, to purchase stock of the other stockholder. The option was assigned to the corporation, which exercised the option and acquired the stock from such other stockholder.

It is true that Phoenix became the owner of only 900 of the 1,000 outstanding shares of Nedick's, Inc. However, Nedick's, Inc., had options to purchase the remaining shares, and, prior to the payment of the final installment, it purchased 50 of such shares. Thus, at the time of redemption, Phoenix owned 900 of the 950 outstanding shares. Shortly thereafter Phoenix acquired the remaining 50 shares for cash and stock. Under the circumstances, we think the redemption cannot be considered as affecting Phoenix' proportionate interest in Nedick's,

Inc., so significantly as to affect the question of whether there was a taxable dividend.

It should be added that the evidence does not indicate that there was a contraction of the business of Nedick's, Inc., which might form the basis for a claim that there was a partial liquidation of the corporation. Nor does the petitioner contend that Nedick's, Inc., did not have earnings and profits available for the payment of a taxable dividend of $1,026,285. In any event, the burden of proof in this respect would be upon the petitioner and it has not shown that there were not sufficient earnings available. Indeed, the records of Nedick's, Inc., indicate that there was earned surplus far in excess of that amount.

The petitioner alternatively contends that if Phoenix was in receipt of a dividend, the amount should be limited to $50,000, stating that its only obligation to the sellers on November 15, 1951, was a liability to pay $50,000 of liquidated damages. This alternative argument would be appropriate only if Nedick's, Inc., had undertaken to pay an obligation of Phoenix. But this is not what happened. As stated above, Phoenix received the distribution and paid its own obligation.

In view of our conclusions above, it follows that Phoenix did not have a net operating loss for the year 1951, which would have the effect of eliminating its tax liability for 1953. The petitioner is liable as a transferee for any income tax liability of Phoenix for the year 1953, with interest. Pursuant to the respondent's admission of the bar of the statue of limitations, we hold that the petitioner is not liable as a transferee for any tax liability of Phoenix for 1951.

*Decision will be entered under Rule 50.*