Sylvan Makover and Frances Makover, et al. [1] v. Commissioner. Makover v. Commissioner
Docket Nos. 2734-65 - 2736-65.
United States Tax Court
T.C. Memo 1967-53; 1967 Tax Ct. Memo LEXIS 205; 26 T.C.M. (CCH) 288; T.C.M. (RIA) 67053; March 22, 1967
*205 A partnership in which petitioners were partners transferred its business and most of its business assets to a newly formed corporation in exchange for all the corporation's stock. At the same time it also transferred an excess of its accounts receivable to the corporation for collection purposes until it could be determined by audit how much of the accounts receivable were required to make the net value of the assets equal the par value of the stock received in the exchange. At the same time the partnership also loaned the corporation $100,000 in cash for which it received a demand note bearing interest at 5 percent. Held, the liability of the corporation to the partnership for the excess of accounts receivable transferred to the corporation for collection, and the note received by the corporation as evidence of the loan, were not "other property" received by the partnership in the exchange, within the meaning of section 351(b), I.R.C. 1954, and the exchange of assets solely for stock qualifies for nonrecognition of gain under section 351(a). Karl W. Windhorst, for the petitioners. Winfield A. Gartner, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, *206 Judge: In these consolidated proceedings respondent determined deficiencies in petitioners' income tax in the amounts and for the taxable years as follows: Docket
Taxable
No.
Petitioner
Year
Deficiency
2734-65
Sylvan Makover and
Frances Makover
1962
$ 9,217.32
1963
1,668.15
2735-65
Thomas Makover and
Mollie Makover
1962
17,285.49
2736-65
Stanford and Lois
Makover
1962
5,852.68 There is only one issue for decision. It is whether, in connection with a transaction whereby a partnership transferred most of its assets and its liabilities to a corporation in exchange for all of its issued stock, a note issued to the partnership by the corporation for cash, and certain accounts receivable, purportedly transferred to the corporation by the partnership for collection, constituted "other property" under section 351(b), I.R.C. 1954, so that gain to the extent of the value thereof is recognizable to the partnership and hence the partners. Other adjustments in petitioners' income tax are automatic, dependent on our decision on this single issue. Findings of Fact Some of the facts have been stipulated and are so found. Thomas and Mollie Makover, Sylvan and Frances Makover, and Stanford and Lois Makover, were husbands *207 and wives, respectively, all residing in Atlanta, Ga., during the years here involved. Each husband and wife filed a joint income tax return for the year or years involved with the district director of internal revenue, Atlanta, Ga. The returns were made and filed on a calendar year basis and cash method of accounting. Thomas and Mollie Makover, and their two sons, Sylvan and Stanford, were members of a partnership known as Thomas Makover & Sons, Thomas having a 35-percent interest, Mollie a 17-percent interest, Sylvan a 30-percent interest, and Stanford an 18-percent interest in the partnership. The partners will be referred to herein collectively as petitioners and Thomas Makover & Sons as the partnership. The partnership filled a Federal information return for its fiscal year ended January 31, 1962, with the district director of internal revenue, Atlanta, Ga. The partnership, which accounted for its income and expenses on a fiscal year basis ending January 31, was formed in 1951 and the initial capital accounts of all the partners totaled $50,000. From 1951 to February 1, 1961, the partnership was engaged in the business of buying and selling piece goods used in the manufacture *208 of wearing apparel, principally ladies' and children's ready-to-wear clothing. Shirley Cloak & Dress Co., Inc. (referred to herein as Shirley, Inc.), was a corporation formed in 1946 with the petitioners owning all its issued and outstanding stock. This corporation was engaged primarily in the distribution, and possibly to a small extent in the manufacture, of ladies' and children's sportswear. Shirley, Inc., purchased manufactured goods from about 12 contract manufacturers, who bought piece goods used to manufacture their products from the partnership. Pleasure Togs, Inc., was another corporation formed by petitioners in 1946 and all of its issued and outstanding stock was owned by petitioners. Pleasure Togs, Inc., was engaged in the business of manufacturing ladies' and children's wearing apparel. It bought piece goods and trim from the partnership but purchases by Pleasure Togs, Inc., resulted in only a small part of the accounts receivable of the partnership. In 1952 the partnership acquired, by contribution from the partners, all of the stock of both Shirley, Inc., and Pleasure Togs, Inc. The partnership's basis in the stock of Shirley, Inc., was $110,000; its basis in the stock *209 of Pleasure Togs, Inc., was $60,000. However, the stock of each corporation was included in the financial statements of the partnership at book value rather than at cost. The capital accounts of the partners thus reflected the book value of the two corporations, as adjusted each year, rather than the partners' original cost in the stock of the two corporations. The book value of the stock of Shirley, Inc., as of January 31, 1953, was $388,713.58, and that of Pleasure Togs, Inc., as of January 31, 1953, was $106,804.97. The partnership purchased piece goods, zippers, buttons, etc., from about 100 suppliers - mills, converters, and jobbers. These suppliers offered liberal credit terms to the partnership, generally net 70 days or net 70 days plus 60 days extra. On the other hand the partnership did not have to extend such liberal terms to the manufacturers who bought from the partnership and sold their manufactured goods to Shirley, Inc. The partnership, which sold principally to the 12 contract manufacturers, rendered bills to the contract manufacturers on a regular basis as its goods were delivered. In turn the contract manufacturers rendered their bills on a weekly basis to Shirley, *210 Inc. By agreement of all concerned, Shirley, Inc., made payment of the bills received from the contract manufacturers by issuing two checks, one to the partnership for the goods sold to the contract manufacturer, and the other to the contract manufacturer for his work. Thus, the partnership enjoyed not only liberal terms from its creditors but also rapid collections of its accounts receivable. Consequently, the partnership had no cash problem in taking care of its normal operations. In 1960 petitioners decided to form a corporation and contribute most of the assets and liabilities of the partnership to it. The business of the partnership would thereafter be conducted by the corporation but the partnership would remain in existence as an investment vehicle for the partners. Petitioners felt that the business would grow faster in corporate form and that stock in the corporation might someday be sold to the public. Sylvan Makover was designated by petitioners to determine the best plan for accomplishing the above objective and to carry it out. Sylvan called upon the long-time accountant for the Makover interests, Joseph Cuba, for his assistance and advice. Cuba was both a certified public *211 accountant and a lawyer and was thoroughly familiar with the Makover interests. After several consultations Sylvan and Cuba met on January 21, 1961, and agreed upon a plan to be followed in incorporating the business. They considered that the net worth of the partnership, exclusive of its cash but taking into account its inventories, furniture and fixtures, the stock of Shirley, Inc., and Pleasure Togs, Inc., most of its accounts receivable, and all of its liabilities, was about $850,000. They thought the corporation could operate successfully with a beginning capitalization of $850,000. It was therefore decided that the partnership should transfer to the corporation assets of the above type which, after deducting the liabilities of the partnership, would have a net value of $850,000, in exchange for which the corporation would assume the partnership's liabilities and issue to the partners 8,500 shares of its $100-par-value stock. The transfer was to take place on February 1, 1961, after the close of the partnership's fiscal year ending January 31, 1961. Sylvan and Cuba realized that the true value of the partnership's assets could not be determined until an audit of Shirley, Inc., *212 and Pleasure Togs, Inc., had been made. They believed that the net worth of the assets and liabilities of the type that were to be transferred to the corporation totaled about $880,000, and decided that the partnership should retain enough of its accounts receivable to reduce the net value to $850,000. However, until the audits of Shirley, Inc., and Pleasure Togs, Inc., could be completed and the true value of the other assets to be transferred could be accurately determined it was decided to transfer all of the accounts receivable to the corporation for collection. Upon completion of the audits the corporation would remit to the partnership any amounts collected on receivables in excess of the amount required to equal the net value of $850,000. Petitioners did not want to transfer the partnership cash to the corporation because they thought they would need it in April to pay their personal income taxes and because they did not think the corporation needed the cash. Petitioners anticipated that their personal income tax requirements would be larger than usual in April because they would not only have to pay any balance due on their 1960 tax but would also have a large estimated tax *213 payment to make because theer income for 1961 would include not only their share of the partnership income for its fiscal year ended January 31, 1961, but also the salaries they would be paid by the corporation. It was felt that because of the difference in the length of time the corporation was allowed for payment of its suppliers and the much shorter length of time within which its receivables were paid, the corporation would not need much starting cash, and what it needed could be borrowed from the bank. Cuba advised Sylvan that if the transaction was to qualify as a tax-free exchange under the internal revenue laws the transfer would have to be made from the partnership to the corporation solely in exchange for stock of the corporation and that the partners would have to be in control of the corporation after the transfer. Consequently, the plan advised by Cuba and agreed to by Sylvan did not involve the corporation incurring any indebtedness to the partnership for the assets transferred. The new corporation, Thomas Makover & Sons, Inc., was organized and began business on February 1, 1961. On January 25, 1961, Sylvan and Cuba went to the Fulton National Bank in Atlanta, Ga. (hereinafter *214 referred to as the bank), with which petitioners had done business for a number of years, to explain their plan for incorporating the partnership business and to inquire about establishing a line of credit for the new corporation. The officer of the bank to whom they talked had handled the petitioners' business accounts for a number of years and was familiar with the financial structures of the various business interests and the financial integrity of petitioners. He advised Sylvan that it would be no problem for the corporation to borrow whatever money it needed and arrangements were made for the corporation to borrow up to $200,000 when it started in business. On February 1, 1961, the partnership transferred to the new corporation all of the capital stock of Shirley, Inc., and Pleasure Togs, Inc., all of its inventories, all of its accounts receivable, its furniture and fixtures, and its prepaid assets. The corporation took over all of the partnership business liabilities and issued to the partners 8,500 shares of its $100-par-value capital stock, in proportion to the partners' respective interests in the partnership. No additional capital stock was issued. Cuba completed an audit *215 of Shirley, Inc., and Pleasure Togs, Inc., on or about March 1, at which time it was determined that the value of the capital stock of Shirley, Inc., was $664,932.13 and the value of the capital stock of Pleasure Togs, Inc., was $189,051.46. Using these values for the capital stock of those two corporations, it was determined that the net worth (assets less liabilities) of that which was transferred by the partnership to the new corporation exceeded $850,000 by $30,059.73, which was considered to be the amount of accounts receivable collected by the corporation for the partnership. Inasmuch as the partners did not need this cash at that time that amount was set up on the corporation and partnership books as a loan payable by the corporation to the partnership. The corporation paid the partnership $31,087.18 on April 17, 1961. On or about March 1, 1961, the following opening entries were made on the corporation books, as of February 1, 1961: Accounts receivable
$340,559.72
Inventory
410,413.97
Prepaid insurance
1,644.17
Prepaid taxes and licenses
40.42
Investments
853,983.59
Shirley Cloak and Dress Com-
pany, Inc.
$664,932.13
Pleasure Togs, Inc.
189,051.46
$853,983.59
Furniture and fixtures
$ 1,252.82
Meter deposit
20.00
Loans receivable
500.00
Accounts payable
$724,622.03
Due to Shirley Cloak and Dress Co., Inc.
2,037.05
Accrued social security taxes
213.82
Withholding taxes - Federal
415.70
Withholding taxes - Georgia
25.98
Accrued unemployment taxes
85.53
Accrued taxes
459.75
Accrued expenses
353.27
Employees reserve insurance
141.83
Loans payable - Thomas Makover and Sons - Partnership
30,059.73
Capital stock
850,000.00
To record purchase of assets and liabilities assumed from
Thomas Makover and Sons (a partnership) on February 1,
1961 in exchange for 8,500 shares of capital stock having a
par value of $100 per share
*216 The foregoing entry made on or about March 1, 1961, was the first one appearing in the books of the corporation. On or about March 1, 1961, the following entries were made on the partnership books, as of February 1, 1961: Loan receivable - Thomas
Makover & Sons, Inc.
$ 30,059.73
Accounts payable
724,622.03
Accrued taxes
459.75
Accrued unemployment
taxes
85.53
Accrued expenses
353.27
Employees reserve insur-
ance
141.83
Social security taxes re-
serve
213.82
Withholding tax reserve
- Federal
415.70
Due to Shirley Cloak and
Dress Co., Inc.
2,037.05
Withholding taxes -
Georgia
25.98
Reserve for depreciation
- furniture and fix-
tures
5,203.95
Thomas Makover - capi-
tal
297,500.00
Sylvan Makover - capital
255,000.00
Stanford Makover - capi-
tal
153,000.00
Mollie Makover - capital
144,500.00
Accounts receivable
$340,559.72
Inventory
410,413.97
Prepaid insurance
1,644.17
Prepaid taxes and licenses
40.42
Investment
853,983.59
Furniture and fixtures
6,456.77
Deposit on meter
20.00
Loans receivable
500.00
To record transfer of assets and lia-
bilities to Thomas Makover &
Sons, Inc., a Georgia Corporation,
on February 1, 1961 On or about February 1, 1961, Sylvan went to the bank to borrow money in behalf of the corporation. It was planned that he would *217 borrow $200,000 from the bank because he thought this appearance of a line of credit would enhance the corporate balance sheet for credit ratings. At that time, without discussing the matter with Cuba or telling Cuba what he intended to do, Sylvan decided that, inasmuch as the partnership had approximately $140,000 in cash on hand which the partners would not need until April 15, 1961, it would be better for the corporation to borrow $100,000 from the partnership and $100,000 from the bank. Consequently, Sylvan borrowed only $100,000 from the bank, for which he gave the bank a corporate note for that amount plus interest at 5 percent due on May 2, 1961. On or about the same date Sylvan also borrowed $100,000 for the corporation from the partnership and gave the partnership a 5-percent demand note from the corporation. Cuba did not become aware of the fact that the corporation had borrowed money from the partnership until he made the opening entries in the books of the corporation, at which time it was too late to reverse the transaction. The bank loan and the partnership loan were thereupon set up on the corporation books as notes payable, being the second and third entries, respectively, *218 on the corporate books. The note to the bank was paid when due; subsequently the bank made another loan of $100,000 to the corporation evidenced by a 60-day note becoming due July 3, 1961. The latter note was paid when due and the corporation did not borrow any further amounts from the bank. The following payments were made on the demand note given by the corporation to the partnership: Amount of
Date
payment
Sept. 15, 1961
$35,000
Nov. 24, 1961
1,500
Dec. 22, 1961
5,000
Jan. 16, 1962
23,500
Mar. 2, 1962
4,000
June 15, 1962
12,500
Oct. 24, 1962
10,000
Mar. 22, 1965
5,500
The corporation deducted the interest payments made by it to the partnership on the above liability and on audit the deduction was accepted without change by the respondent. Shirley, Inc., borrowed money from the bank from time to time subsequent to May 2, 1961. It owed the bank nothing from July 14, 1961, to August 25, 1961; it was indebted to the bank in the amount of $506,000 on January 9, 1962. On September 1, 1962, Shirley, Inc., was merged into Thomas Makover & Sons, Inc., with the latter being the surviving corporation, and the name of the corporation was then changed to Shirley of Atlanta, Inc. Shirley of Atlanta, Inc., has continued *219 to borrow money from the bank from time to time to meet its somewhat seasonal needs. Ultimate Findings of Fact The loan of $100,000 in cash from the partnership to the corporation and the transfer of certain of its accounts receivable by the partnership to the corporation for collection were not properties transferred to the corporation in connection with the incorporation of the partnership business; they were not interdependent with the transactions incorporating the partnership business. The note in the amount of $100,000 issued by the corporation to the partnership as evidence of the above loan, and the liability from the corporation to the partnership resulting from collection of the above accounts receivable did not constitute "other property" received by petitioners upon the exchange of partnership assets for stock of the new corporation under section 351, I.R.C. 1954. Opinion Under section 351(a) of the 1954 Code [2] *221 no gain or loss is recognized to the transferors if property is transferred to a corporation by one or more persons solely in exchange for stock or securities of the corporation and immediately after the exchange such person or persons are in control of the corporation. *220 However, under section 351(b), [3] if in an exchange which would qualify under subsection (a) except for the fact that, in addition to stock or securities of the corporation, the transferors receive other property or money, then gain (if any) shall be recognized to the transferors, but not in excess of the amount of money received plus the fair market value of such other property received. The question here is whether the note issued by the corporation to the partnership evidencing a loan of $100,000 and the liability of the corporation to the partnership in the amount of $30,059.73 resulting from the collection by the corporation of accounts receivable in that amount transferred by the partnership to the corporation, purportedly for collection only, constitute "other property" under section 351(b), so that gain is to be recognized to the partnership and the partners on the exchange. Respondent contends that the $100,000 in cash and the $30,059.73 of accounts receivable were part of the partnership property transferred to the corporation in the exchange, that the note and the receivable (representing the liability of the corporation to the partnership for accounts receivable collected by the corporation for the partnership) from the corporation to the partnership constituted "other property" received by the partnership in the exchange, *222 and that hence gain is to be recognized on the transaction to the extent of the fair market value (which he claims is face value) of this "other property." Petitioners claim that the cash representing the loan and the accounts receivable were not transferred to the corporation as a part of the exchange, but were separate and independent transactions, and hence they received solely stock in the exchange, and under subsection (a) no gain is to be recognized. The parties are in agreement that the transferors were in "control" of the corporation "immediately after the exchange," that the fair market values of the note and the receivable were their face values, and that if gain is to be recognized on the exchange petitioners realized a gain at least equal to the combined face values of the note and the receivable. Petitioners do not argue that the note and the receivable qualified as "securities" issued by the corporation, under subsection (a), or that they would not qualify as "other property or money" under subsection (b) if it is determined that they were received in the exchange. Thus the only question we must decide is whether the transfer of the cash and the accounts receivable to *223 the corporation was a part of the plan for incorporating the partnership business. This is a question of fact and our findings of ultimate fact are conclusive of the issue. There can be little doubt from the evidence presented that the plan for incorporating the partnership business, as originally conceived and agreed upon by Cuba and Sylvan, was to capitalize the corporation at $850,000 by transferring to it all of the stock of Shirley, Inc., and Pleasure Togs, Inc., all of the inventory, the furniture and fixtures, and the prepaid assets of the partnership, and enough of the accounts receivable of the partnership which, after deducting all of the liabilities of the partnership assumed by the corporation, would produce a net value of properties transferred to the corporation of $850,000; and that this property was to be transferred to the corporation in exchange for 8,500 shares of its $100-par-value stock. The partnership used a fiscal year ending January 31 for its accounting and it was decided to culminate the transaction as of the end of its fiscal year, January 31, 1961. Because it would be necessary to complete an audit of Shirley, Inc., and Pleasure Togs, Inc., to determine *224 the actual value of the stock of those two corporations, which audits could not be completed by January 31, it was decided that all of the accounts receivable of the partnership would be transferred to the corporation until it could be determined how much of them would be required to bring the net value of the assets transferred up to $850,000, with the understanding that any amount of the accounts receivable collected by the corporation in excess of the amount required as above would be returned to the partnership. It was not intended that the excess of the accounts receivable should be included in the property transferred to the corporation in the exchange. This was the unqualified and uncontradicted testimony of both Cuba and Sylvan. While the entries made in the books of both the partnership and the corporation do reflect a transfer of all the accounts receivable from the partnership to the corporation, they also reflect the liability of the corporation to the partnership for the excess. We do not find this to be inconsistent with the plan as outlined by Cuba and Sylvan. Collections were undoubtedly being received on the accounts during the month of February, prior to the time *225 audits of Shirley, Inc., and Pleasure Togs, Inc., were completed, and it would have been difficult to segregate a specific part of the accounts receivable as belonging to the partnership until the correct amount was determined. We believe this was simply a matter of expediency and did not indicate a modification of the original plan. Cuba and Sylvan also testified unequivocally, and without any evidence to contradict them, that it was never intended that the partnership transfer any of its cash to the corporation as a part of the exchange. The corporation had been operating successfully with a net worth of about $850,000 and they thought the corporation could carry on successfully with a starting capital of $850,000. While the partnership had borrowed money from time to time to meet the seasonal demands of its business, because of the liberal credit terms it received from its suppliers and the relatively short time it was required to wait to collect its receivables from its buyers, the business did not need a great deal of cash working capital. What it did need could very readily be obtained from the bank; this is well supported by the testimony of the banker. Also the partners felt *226 they would need the cash in the partnership to pay their income taxes in April of 1961, which they anticipated would be high due to the termination of the partnership's fiscal year in their calendar year 1961 coupled with their going on a salary basis with the corporation. The partners had customarily withdrawn cash from the partnership to pay their income taxes. And, furthermore, it would have been poor tax planning, which we cannot attribute to either Cuba or Sylvan, to transfer a sizable amount of cash, upon which income tax either had been or would have to be paid by the partners, from the partnership to the corporation and run the risk of having it taxed again when it was withdrawn from the corporation. Such was not the plan. However, we agree with respondent that tax consequences depend not upon what might have been done or what was anticipated would be done, but rather what in substance, form, and fact was done. Gus Russell, Inc., 36 T.C. 965; Television Industries, Inc. v. Commissioner, 284 F. 2d 322, affirming 32 T.C. 1297. But we can find no support in the evidence that what was done, with respect to the exchange and the plan for incorporating the partnership business, *227 was materially different from what was planned in this regard. It is true that the corporation did not immediately pay to the partnership the $30,059.73 excess of accounts receivable it had collected for the partnership. However, this amount was paid on April 17, 1961, at which time the partners made sizable withdrawals of cash from the partnership to pay their taxes. We do not think this delay of about a month and a half indicates that the plan was changed. It is also true that although Sylvan had previously arranged a line of credit for the corporation with the bank in the amount of at least $200,000, when he went to the bank to borrow some money for the corporation on February 1, 1961, he decided to borrow only $100,000 from the bank and the other $100,000 from the partnership. Sylvan testified that he did this because he realized that the partnership had the cash available which the partners would not need until April and that he thought it would be better to put the partnership cash to work earning interest for that short time than to borrow all the money from the bank. He did not consult Cuba before doing this. The note was a demand note and did bear interest at 5 percent and *228 a large part of it was paid off from time to time within about 1 year as the partners needed cash for payment of taxes. We are convinced from the testimony of both Cuba and Sylvan this transfer of cash from the partnership to the corporation in exchange for a note was not a part of the plan for incorporating the partnership business, and in fact that no cash was transferred by the partnership to the corporation as a part of the exchange. This finds support in the book entries of both the partnership and the corporation which set this note up as a separate transaction. We believe that Sylvan intended to borrow money for the corporation, whether to establish a line of credit for the corporate balance sheet, as he testified, or because the corporation needed the working capital we need not decide, but that this borrowing of money was intended to be and was entirely separate and independent of the exchange of property by the partnership for stock of the corporation. If it was independent of the exchange it would make no difference whether the money was borrowed from the bank or from the partnership. There is no question of thin capitalization here; respondent recognizes that it was a *229 loan. Respondent contends that even if the loan from the partnership to the corporation was independent of the exchange, nevertheless it must be considered a step in a single transaction whereby the partnership assets were transferred to the corporation in exchange for stock and other property. The step-transaction theory was succinctly stated as follows in American Bantam Car Co., 11 T.C. 397, affirmed per curiam 177 F. 2d 513, certiorari denied 339 U.S. 920: In determining whether a series of steps are to be treated as a single indivisible transaction or should retain their separate entity, the courts use a variety of tests. * * * Among the factors considered are the intent of the parties, the time element, and the pragmatic test of the ultimate result. An important test is that of mutual interdependence. Were the steps so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series? We have heretofore found that there was no intent to transfer the cash and the excess accounts receivable as a part of the exchange. The time element and the ultimate result factors can be argued either way. Consequently, we feel that *230 the mutual interdependence test should be given considerable weight here. Respondent argues that the transfer of the other assets would have been meaningless without the transfer of cash, and hence the workability of the entire plan was dependent on the transfer of the cash, and the transfer of cash was thus but a step in the one transaction, for which the partnership received both stock and "other property." We find no evidence to support this supposition and we think the facts belie it. If cash was needed to permit the corporation to continue the business, it is clear from the evidence that the corporation could have borrowed whatever it needed from the bank. Furthermore, it is agreed that the accounts receivable which were transferred to it in the exchange, totaling about $310,000, were practically the equivalent of cash and if cash was needed before they were collected the accounts could readily have been discounted for cash. The exchange of the other assets for stock and the borrowing of cash by the corporation from the partnership were not mutually interdependent. The transfer of the partnership business to the corporation could readily be accomplished without the transfer of *231 the cash and the excess accounts receivable. For the reasons mentioned above and others apparent from the record, we have found as an ultimate fact that the $100,000 note and the receivable in the amount of $30,059.73 were not "other property" received by the partnership in exchange for property transferred to the corporation within the meaning of section 351(b). Therefore the exchange of property by the partnership was solely for stock of the corporation and no gain on the transaction is recognizable to the partnership or the partners by virtue of section 351(a), and we so hold. [4] Decisions will be entered for the petitioners. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Thomas Makover and Mollie Makover, docket No. 2735-65; and Stanford Makover and Lois Makover, docket No. 2736-65.↩
2. All references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR. (a) General Rule. - No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property. 3. Sec. 351(b). Receipt of Property. - If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money then - (1) gain (if any) to such receipient shall be recognized, but not in excess of - (A) the amount of money received, plus (B) the fair market value of such other property received; and (2) no loss to such recipient shall be recognized.↩
4. Compare Enola C. Hartley, T.C. Memo. 1967-38↩, herewith.