Glenn-Minnich Clothing Company, Inc., et al. [1] v. Commissioner. Glenn-Minnich Clothing Co. v. Commissioner
Docket Nos. 72546-72550.
United States Tax Court
T.C. Memo 1960-207; 1960 Tax Ct. Memo LEXIS 84; 19 T.C.M. (CCH) 1131; T.C.M. (RIA) 60207; September 30, 1960
*84 Pursuant to an alleged "retirement pay" contract, the corporate petitioner paid certain amounts to its vice president and his son, an employee, upon their retirement, and upon the sale of the vice president's stock to the remaining stockholders. Held: the amounts paid were not additional compensation in consideration of or in recognition of former services and are not deductible by the corporate petitioner pursuant to section 162(a)(1) of the Internal Revenue Code of 1954. Held, further, the amounts paid to the vice president and his son were, in fact, in consideration of the sale of the vice president's stock and such amounts are constructive dividends to the purchasing shareholders. Reasonable allowance for salaries to the corporate petitioner's secretary-treasurer determined. The corporate petitioner entered into a new lease prior to the expiration of its prior lease. Held, the unrecovered costs of leasehold improvements were not deductible in the year the lease expired but were amortizable over the term of the new lease. East Kauai Water Co., Ltd., 11 T.C. 1014 (1948), followed. Robert Ash, Esq., 1921 Eye Street, N.W., Washington, D.C., andcarl F. Bauersfeld, Esq., for the petitioners. *85 Ferd J. Lotz, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: The respondent determined deficiencies in the petitioners' income taxes for the years and in the amounts as follows: Docket
Taxable Year
Defi-
No.
Petitioner
or Period
ciency
72546
Glenn-Minnich Clothing Co., Inc.
1954
$3,410.43
1955
4,793.77
72547
Estate of C. B. Minnich (Deceased), Fred S.
Minnich, Executor
4/18/56 to
12/31/56
506.15
72548
Estate of C. B. Minnich (Deceased) by
Fred S. Minnich, Executor
1955
2,143.06
1/1/56 to
4/17/56
232.84
72549
H. A. Glenn and Amy N. Glenn, Husband
an Wife
1955
868.04
1956
913.58
72550
S. Myrl Glenn, Sr. and Clara J. Glenn, Hus-
band and Wife
1955
2,833.98 The issues are: (1) Whether certain amounts paid during the years 1955 and 1956 by the corporate petitioner to its former vice president and stockholder, and to his son, a former employee, were properly deductible by the corporation as retirement pay, or (2) Whether any part of the amounts so paid were in partial payment of the former vice president's stock and constructive dividends to the purchasing and remaining stockholders; (3) Whether amounts paid by the corporate petitioner to its secretary-treasurer for 1954, 1955, and 1956 *86 were reasonable allowances for salaries for personal services actually rendered and deductible pursuant to section 162(a)(1) of the Internal Revenue Code of 1954; [2] and (4) Whether the corporate petitioner is entitled to a deduction pursuant to section 167(a)(1) for the unrecovered cost of leasehold improvements for the year 1955, the year in which the lease expired although petitioner entered into a new lease prior to the expiration of the old lease. The question of whether the respondent erred in reducing the corporate petitioner's net operating loss carried back from 1956 to 1954 is dependent upon resolution of the other issues. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. The petitioner Glenn-Minnich Clothing Company, Inc., hereinafter sometimes referred to as the corporation, organized and existing by virtue of the laws of the State of Virginia, has its principal place of business in Roanoke, Virginia. It keeps its books and records and reports its income for calendar years on an accrual method of accounting. The corporation timely filed income tax returns for the calendar *87 years 1954 and 1955. Income tax returns were filed on behalf of C. B. Minnich, deceased, hereinafter referred to as Minnich, for the calendar year 1955, and for the taxable period January 1, 1956 to April 17, 1956, the date of his death. Petitioner Herman A. Glenn, hereinafter referred to as Herman, and Amy N. Glenn, husband and wife, reside in Roanoke. They timely filed joint income tax returns for the calendar years 1955 and 1956. Petitioners S. Myrl Glenn, Sr., hereinafter referred to as Myrl, and Clara J. Glenn, husband and wife, reside in Roanoke. They timely filed a joint income tax return for the calendar year 1955. All the above returns were filed with the district director of internal revenue, Richmond, Virginia. The corporation has been engaged in the retail clothing business in Roanoke at all times since it was organized in 1913. Prior to March 10, 1955, Minnich was president, Myrl was vice president, and Herman, Myrl's brother, was secretary-treasurer of the corporation. Each owned one-third, 166 shares, of the corporation's outstanding stock. The corporation paid its officers' salaries in the following amounts for the years 1941 to 1955, inclusive: C. B.
S. M.
H. A.
Year
Minnich
Glenn, Sr.
Glenn
1941
$10,000
$10,000
$10,000
1942
10,000
10,000
10,000
1943
10,000
10,000
10,000
1944
10,000
10,000
10,000
1945
12,000
12,000
12,000
1946
12,200
12,200
12,200
1947
12,200
12,200
12,200
1948
12,500
12,500
12,500
1949
12,400
12,400
12,400
1950
11,000
11,000
11,000
1951
11,000
11,000
11,000
1952
11,000
11,000
11,000
1953
10,000
10,000
10,000
1954
10,000
10,000
10,000
1955
15,000
2,500
15,000
(2 mos.)
The *88 corporation's gross sales, gross profits, and net income or loss, as reported on its returns for the years 1944 to 1955, inclusive, were as follows: Gross
Gross
Net Income
Year
Sales
Profit
or Loss
1944
$311,315.39
$107,656.37
$21,301.26
1945
333,910.02
203,007.46
29,644.05
1946
460,955.98
158,742.62
40,167.16
1947
530,417.83
181,114.12
30,425.68
1948
533,776.96
175,660.21
16,384.57
1949
508,781.80
168,029.36
9,973.33
1950
505,773.31
173,157.20
11,614.11
1951
509,023.38
173,812.23
12,956.04
1952
524,581.10
182,549.62
13,234.75
1953
528,948.10
176,581.87
6,825.87
1954
490,842.23
169,346.97
7,456.98
1955
475,377.47
170,347.83
(6,916.35)
During the years 1952 and 1953, the three officers of the corporation, because of the illness of two of them and the age of all three, became greatly concerned over the future security of the corporate business and their own retirement, and they often discussed these matters. Early in 1953 they decided to confer with William Pierce, hereinafter referred to as Pierce, an attorney who was the trust officer for the Colonial-American National Bank. They authorized Pierce to work up a "retirement plan" and submit it to them. Thereafter, Pierce mailed to the officers a memorandum outlining such a plan. Sometime *89 late in January 1955, the officers met with Pierce and discussed the plan. At that time Minnich was 76 years of age, Herman was 70 and Myrl was 62. The memorandum stated that the objectives of the plan were to: 1. Provide for perpetuation of successful business (a) By switching ownership interests to employees trained in the operation of the business by present owners, instead of allowing ownership to be purchased by outsiders. (b) By giving present able employees an interest in the profitable operation of the business so that they will not take other jobs. (c) By making possible retirement of employees at a selected retirement age thus giving younger employees opportunity for advancement. 2. Provide for income to present owners upon retirement. 3. Provide for a sale by present owners of ownership interests at full value rather than possible sacrifice sale by the estates of present owners. 4. Provide for families and relatives of present owners to get full benefit from interests in business. If the business interests were passed on to their families by the present owners, very little benefit could be obtained by the wives and children since no dividends are paid upon the stock. It *90 does not appear that the plan can be the usual type of stock purchase agreement among owners of a closely held corporation because: 1. All of the present three owners are at or are approaching customary retirement ages and very likely do not wish to take on additional responsibility in the event of the death of the other owners. 2. None of the owners are particularly desirous of putting up the necessary cash to buy the interest of another owner from his estate, and cash cannot be provided by life insurance. * * *
The essence of the plan is to transfer ownership of the business to the younger employees by making it possible for them to purchase an interest in the business and at the same time pay to the present owners and their estates full value for present ownership interests without incurring large tax consequences. It was further stated that the "simplest elements of the plan would be as follows": 1. Present owners would agree to sell their stock for a certain price upon reaching an agreed upon retirement age, which age is generally sixty-five. 2. Employees would agree to purchase stock at the stipulated price and pay purchase price in installments over a period of, say, 10 years, *91 with interest to be paid to present owners on unpaid purchase price balance. 3. Employees salaries would be raised on a seniority and ability basis with the raise earmarked for making payments on the stock, and rights to buy stock would also be awarded on the basis of seniority and ability. 4. Present owners with approximately $60,000 worth of stock could each expect to receive $6,000 per year on purchase price plus interest on unpaid balance which in first year at 6 per cent would be $3,300, $3,000 second year, etc. In addition to this, each of the present owners would receive interest on amounts presently loaned to the business and could loan additional money to the business if needed. 5. Salaries to present owners would be discontinued at retirement age, or would be materially reduced if present owners desired to remain active on a part-time basis in an advisory capacity. Thus, the business could afford to raise salaries of younger employees as provided in "3" above. 6. The present owners would retain a first lien on the stock as security for the unpaid portion of the purchase price. 7. Stock would be restricted as to transfer so that it could only be sold to other employees upon *92 the death or retirement of employees purchasing it. While the memorandum suggested that the three owners retire at a given age, at the meeting with Pierce, Herman and Minnich wanted all three stockholders to retire at the same time, and upon that condition were ready to adopt such a plan. However, Myrl, since he was only 62, did not want to retire at that age and refused to go along with that condition. The officers failed to reach agreement on this point and Myrl offered to sell his stock outright to the other stockholders for its "'fair book value' - meaning the price shown on the books as of December 31, 1954, plus a fair price for the furniture and fixtures and good will." In the alternative, Myrl was willing to have the business liquidated. Herman and Minnich immediately and verbally agreed each to buy one-half of Myrl's stock, believing Myrl meant to sell at actual book value. Thereafter, pursuant to Myrl's instructions, Pierce had an attorney, Walter W. Wood, hereinafter referred to as Wood, submit a written contract for the purchase of Myrl's stock to Pierce. Pierce informed Myrl that the contract sales price was at book value, a little less than $70,000, whereupon Myrl refused *93 to accept the contract. By letter dated March 1, 1955, Wood informed Myrl that he was acting as attorney for Herman in this matter, that his client had informed him that he wished specific performance of this contract, and that he would be willing to confer with Myrl or his attorney before pursuing the matter further. Myrl hired an attorney, C. D. Fox, and conferred with the corporation's accountant, Clyde Brown, to help him determine a fair price for his stock. After consulting with Brown, Myrl informed Fox that he wanted $80,000 for his stock. However, Myrl also felt that he and his son, Samuel Myrl Glenn, Jr., hereinafter referred to as Samuel, were entitled to severance and retirement pay inasmuch as he had worked for more than forty years and Samuel had worked for thirteen or fourteen years in the business. On March 10, 1955, Myrl tendered his resignation as vice president, which was accepted at a special stockholders' meeting in Wood's office. At that meeting Herman's son, William L. Glenn, hereinafter referred to as William, was elected a director of the corporation. On the same day, at a directors' meeting in Wood's office, William was elected vice president, and the officers *94 were authorized to execute the following contract, which was duly executed on that day, between the corporation, as party of the first part, and Myrl and Samuel, as parties of the second part: That for and in consideration of the mutual promises and undertakings by the parties as hereinafter set out, the parties agree as follows: 1. S. Myrl Glenn, Sr. will resign as an officer and director of the Glenn Minnich Clothing Company, Incorporated, and his resignation will be accepted at a meeting of the corporation. 2. The corporation, for services rendered and as retirement pay, will pay to S. Myrl Glenn, Sr. and Samuel Myrl Glenn, Jr. each the sum of $526.31 per month beginning April 1, 1955 and ending October 1, 1956. In case either of the parties of the second part die before the full amount has been paid, then such sums as would go to them is to be paid to their respective widows, and if their respective widows do not survive them, then such sums shall be paid to their estates. 3. The party of the first part will pay to Mrs. Cook, a former employee of Glenn Minnich Clothing Company, Incorporated, a minimum of $15.00 per month for her maintenance and support so long as she may live. *95 4. S. Myrl Glenn, Sr. shall have the privilege of removing his desk, chair and any and all personal effects which are now located in the store operated by Glenn-Minnich Clothing Company, Incorporated. 5. There is a $2,000.00 life insurance policy upon the life of S. Myrl Glenn, Sr. which policy is carried with the Philadelphia Life Insurance Company and is numbered 32363 and it is agreed that if and when the proceeds of said policy are collected, then said proceeds will be paid to the living, retired, employees of Glenn Minnich Clothing Company, Incorporated and will be distributed among them in a fair and equitable manner. 6. The party of the first part is now carrying a group insurance policy with the Life Insurance Company of Virginia designated as Policy G-292, and included in this policy is S. Myrl Glenn, Sr. It is agreed that the party of the first part will continue to carry this insurance on S. Myrl Glenn, Sr. with the further understanding that if additional premiums, caused by reason of S. Myrl Glenn, Sr. being retired, are incurred, then such additional premiums are to be paid by S. Myrl Glenn, Sr., it being further understood that said insurance is not to be carried beyond *96 October 31, 1956. 7. It is further agreed and understood between the parties hereto that the parties of the second part shall have the privilege of purchasing clothing for themselves and members of their families from the party of the first part at the usual wholesale price. 8. The present lease on the premises on which the business is carried on located at 108 West Campbell Avenue will expire July 31, 1955 and that in order that a renewal of said lease can be negotiated between the party of the first part and S. D. Ferguson, the landlord, S. Myrl Glenn, Sr. agrees that he will personally contact Mr. S. D. Ferguson and assure him that all differences between himself, C. B. Minnich and Herman A. Glenn have been satisfactorily settled, and will request Mr. S. D. Ferguson to negotiate a new lease with the party of the first part. It is further agreed and understood that neither of the parties of the second part will attempt in any manner to interfer [interfere] with negotiations to be carried on between the party of the first part and Mr. S. D. Ferguson nor will they enter into any lease with Mr. S. D. Ferguson for said premises. At this time, Samuel was being paid by the corporation *97 an annual salary of approximately $5,000. Myrl would have financially aided Samuel sufficiently to support his wife and child had the corporation not been willing to make these payments to Samuel; Myrl had helped Samuel before in such a manner. On or prior to March 11, 1955, Herman and Minnich were willing to pay Myrl $80,000 for his 166 shares of stock. They never entered into any written contract covering the sale of the stock. On March 11, Herman and Minnich made payment to Myrl by their respective personal checks, dated March 11, 1955, each in the amount of $40,000. Myrl endorsed and cashed each check. On March 11, a meeting of the directors was held in Wood's office. The minutes of that meeting stated as follows: "The Chairman of the meeting presented the 166 shares of stock which the corporation has purchased from S. Myrl Glenn, Sr. in accordance with the contract dated the 10th day of March, 1955 by and between Glenn Minnich Clothing Company, Incorporated and S. Myrl Glenn, Sr. and Samuel Myrl Glenn, Jr. Upon motion duly made, seconded and unanimously adopted, it was voted to accept the said stock and cancel same upon the stock book of the corporation. "Upon motion duly made, *98 seconded and unanimously adopted, the following resolution was approved: Resolved, that the proper officers of this corporation be authorized, empowered and directed to issue to C. B. Minnich 83 shares of the stock of this corporation and to issue to Herman A. Glenn 83 shares of the stock of this corporation. "Upon motion duly made, seconded and unanimously carried, the salaries of the officers of Glenn Minnich Clothing Company, Incorporated were fixed as follows: C. B. Minnich, President
$15,000.00
Herman A. Glenn, Secretary-
Treasurer
$15,000.00
William L. Glenn, Vice Presi-
dent
$ 6,000.00
"Upon motion duly made, seconded and unanimously carried, the following resolution was adopted: Resolved: that no stock dividends be declared by the Glenn Minnich Clothing Company, Incorporated without the approval and until so declared by the Board of Directors of this corporation. * * * * *
"We, the undersigned, being all of the Directors of Glenn Minnich Clothing Company, Incorporated hereby waive notice of this meeting and consent to the holding of the above meeting and ratify, confirm and approve all the acts as set forth above." The minutes were signed by Minnich, Herman and William. The corporation *99 made payments to Myrl and Samuel, pursuant to the contract of March 10, 1955, and deducted as retirement pay the amounts of $9,473.58 and $10,526.20 on its returns for 1955 and 1956, respectively. Respondent disallowed these deductions in his notice of deficiency. Respondent concedes error in including the entire amount in Myrl's income as long-term capital gain from the sale of his stock for 1955, and contends that inasmuch as Myrl was on the cash basis, the amount should be included in his income as long-term capital gain only when actually received by Myrl and Samuel in 1955 and 1956. In his statutory notices of deficiencies, respondent determined that these same amounts were constructive dividends to Minnich and Herman equally, as amounts paid by the corporation on their behalf in their purchase of Myrl's stock. Schedule L (balance sheets) attached to the corporation's returns for the years 1954 and 1955 contained the following items, among others: 1954
1955
beginning
end of year
end of year
Cash
$ 46,520.36
$ 51,226.67
$ 12,082.45
Notes & Accounts Receivables
116,105.38
116,065.36
112,993.94
Inventories
115,730.01
107,012.93
121,988.83
Other Assets *
18,091.79
12,905.86
8,284.59
Total Assets
$296,447.54
$287,210.82
$255,349.81
Liabilities *
$ 92,383.57
$ 77,734.54
$ 56,194.62
Capital Stock
49,800.00
49,800.00
49,800.00
Earned Surplus & Undivided Profits
154,263.97
159,676.28
149,355.19
Total Liabilities & Capital
$296,447.54
$287,210.82
$255,349.81
*100 On December 31, 1947, Herman suffered a heart attack while at the corporation's place of business. He was in a hospital until sometime in March 1948. Thereafter, he was at home in Roanoke. Herman had been associated with the corporation since 1913, the year in which it was founded, and had been secretary-treasurer at least since the year 1920. As secretary-treasurer, Herman had been in charge of all financial matters of the firm. It was his duty to supervise all office personnel, to attend to collections, credit, insurance, and some more general matters mostly concerning personnel. At the time of Herman's attack, William was his assistant. William had been associated with the corporation since 1938, except when he was in military service from 1941 to 1945. He had had approximately six years of experience in Herman's office at the time of Herman's attack. On January 1, 1954, the corporation filed a "STATEMENT OF CLAIMANT OR OTHER PERSON," signed by Minnich as president, with the Social Security Administration, certifying that: The wage earner [Herman] performed no service including advisory, writing or signing *101 checks, in his capacity as Sec-Treas. from 1-1-51 to the present time. Social Security Tax reports have been made for the wage earner on the maximum of $3600, per year as we carry the payments to him on our regular salary account expecting him to return to work if his health improved so he could. * * *
During the years after his attack, Herman came to the office only very infrequently, as he never fully recovered. However, after March 1955, Herman's condition was slightly improved, and he was able to come to the office somewhat more frequently. During the years 1954 and 1955, William would confer with Herman at the latter's home several times a week, to discuss the daily business, and the departments of the business that were weak. William also discussed with Herman each month's operation. The corporation used a retail inventory system of accounting which called for a full trial balance every month. Since the trial balance contained data pertinent to the business operation, it was necessary that it be analyzed every month, to determine if expenses, such as salaries, were becoming excessive. It was the only effective control over such items that the officers had, and William received *102 Herman's advice in these matters. During the years 1954 and 1955, the other officers of the corporation would also confer with Herman at his home, sometimes several times a week. Herman also handled whatever bank loans were needed on behalf of the corporation during these years. After Myrl sold his stock and retired, Herman became active in buying for the corporation. He was present at almost all of the corporation's major buying appointments thereafter, and would go to the sample rooms set up in the hotels where the corporation did its buying. Buying is an important function in the retail clothing business. William was Herman's assistant until the year 1949, when he became acting secretary-treasurer. On March 10, 1955, he became vice president, and several months later president of the corporation. Herman retained the title of secretary-treasurer during the years in question. As a consequence mainly of his own experience and ability, although he was aided by Herman's advice and direction during their conferences at Herman's home, William was able to effectively carry on the duties of the secretary-treasurer to the satisfaction of all concerned during the years in question. Petitioner *103 paid Herman during the year 1956 the amount of $8,733.38 * as salary. In his statutory notice of deficiency, respondent disallowed the following portions of the amounts deducted by the corporation as salary paid to Herman during the years 1954, 1955, and 1956: 1954
1955
1956
Salary deducted
$10,000
$15,000
$8,733.38 *
Amount disallowed
7,000
11,000
2,733.38
Since July 1, 1935, the corporation's store has been located at 108 West Campbell Avenue in Roanoke. The first lease covering the occupancy of the store entered into on June 25, 1935, between the petitioner and the lessors, was for a term of 121 months, beginning July 1, 1935. The second lease, executed on October 3, 1944, was for a term of 120 months beginning August 1, 1945, and ending July 31, 1955. This lease contained no renewal provision nor an option to renew. However, it provided that the lease would continue on a monthly basis after the designated expiration date in the absence of a notice to the contrary by either party. On January 1, 1955, the corporation had unrecovered costs as a result of leasehold improvements in the amount of $3,415.61. On March 16, 1955, the corporation entered into a lease covering the same premises with *104 the lessors of the second lease for a term of five years, beginning August 1, 1955, and ending July 31, 1960. The corporation deducted as depreciation the unrecovered leasehold costs on its return for the year 1955. In his statutory notice, respondent disallowed the amount of $2,732.49, as excessive, allowing as a prorata depreication deduction the amount of $683.12 based on a useful life of five years, the term of the new lease. The amount of $19,999.78 received by Myrl and Samuel pursuant to the contract of March 10, 1955, was not a reasonable allowance for services actually rendered to the corporation. This same amount was realized by Myrl for the sale of his stock to Herman and Minnich in the years 1955 and 1956, when received by Myrl and Samuel, and the gain upon that sale is long-term capital gain. The corporation paid the amount of $19,999.78 pursuant to the contract of March 10, 1955, out of its earnings and profits, on behalf of Herman and Minnich, enabling them to acquire a portion of Myrl's stock, and that payment constituted a constructive dividend to Herman and Minnich. Reasonable allowances for Herman's salaries for services actually rendered by him during the years 1954, *105 1955, and 1956 were the amounts of $3,000, $5,000, and $6,000, respectively. The corporation's unrecovered costs of leasehold improvements are recoverable over the five-year term of the new lease of March 16, 1955. Opinion Issue I Although the minutes of the directors' meeting of March 11, 1955, declare that the corporation had purchased Myrl's stock in accordance with the contract of March 10, 1955, that contract, on its face, contains no recital to that effect. Therefore, the corporation contends that the transaction represented by the contract of March 10, 1955, was separate and distinct from the sale of Myrl's stock, in all respects what the contract states it to be, and that the amounts paid pursuant to the contract are deductible by it pursuant to section 162(a)(1) and the regulations thereunder. [3] *106 Respondent contends that the payments to Myrl and Samuel pursuant to the contract were actually in partial payment for Myrl's stock and, therefore, not deductible pursuant to section 162(a)(1). Respondent contends further that even if the amounts are not in partial payment of the stock, the corporate petitioner has otherwise failed to prove that the amounts were reasonable allowances for services rendered. We agree with respondent's first contention. The background to the transactions of *107 March 10 and 11 was that the three stockholders had expressed interest in a plan submitted to them by Pierce which called for the sale of their stock in such manner as to provide for their retirement through the payments for the stock, and also achieve certain business purposes. Myrl's rejection of the plan as contemplated by Herman and Minnich resulted in two alternative proposals by Myrl - the outright sale of his stock, or liquidation of the corporation. As respondent contends, there is nothing in the record to suggest that prior to the time that Myrl rejected the submitted plan the stockholders were thinking in terms of retirement pay in the sense of further compensation for services previously rendered. Petitioner introduced into evidence and relies primarily upon the plan submitted by Pierce; however, as previously stated, that plan contemplated only the controlled sale of the stock to employees; the proceeds of the sale were the only "retirement pay" contemplated. In fact, certain sentences in the memorandum submitted by Pierce, particularly those describing the "simple elements of the plan" numbered "4." and "5.", suggest affirmatively that the corporation was not in a position *108 to pay further salaries for prior services. Pierce had been authorized to work out the plan, and his familarity with the corporation's situation is evident from the detailed considerations set forth in the memorandum. There is no evidence other than self-serving testimony that Myrl was actually entitled to any "retirement pay" separate and distinct from his right to a fair price for his stock. No evidence has been introduced suggesting that Myrl or Samuel had not been fully and adequately compensated for their services of prior years. Myrl's only objection to the plan submitted by Pierce was the simultaneous retirement demanded by Herman and Minnich for all three of them. There is nothing to suggest that Myrl then felt that he was entitled to something other than the payments upon the sale of stock that the plan contemplated. It was only after the disagreement and when he made the alternative proposal of selling his stock outright that he allegedly began to think in terms of "retirement pay." The corporate petitioner suggests that it is important that Myrl would be increasing his own tax liability by arguing that he received retirement pay rather than part payment for the sale of his *109 stock. Petitioner fails to take into account the fact that Myrl received only half of the alleged retirement pay, and Samuel the other half. It is also significant that Myrl transferred his stock only after the contract of March 10 had been executed. The corporate petitioner argues that this is of no importance because Myrl was not paid for his stock until March 11, but it is just as likely that Myrl did not tender his stock prior to that time, so that he and Samuel would be assured of receiving pursuant to the contract the amount of $19,999.78 as well as the amount of $80,000 from Herman and Minnich. That the transactions of March 10 and 11 were not considered as separate and distinct by Herman, Minnich and William is further evinced by the minutes of the meeting of the directors on March 11 signed by them, wherein it is stated that the corporation had purchased the stock "in accordance with the contract dated the 10th day of March, 1955 by and between" the corporation and Myrl and Samuel. The corporate petitioner attempts to explain this statement in the minutes as a mistake by Wood; however, it has offered no reason for Wood being neither a deponent nor witness in this case, and *110 the explanation is not convincing. In determining what Myrl in fact received for the sale of his stock, we have not overlooked the fact, that although the stock was closely held in a small corporation and had not been sold in many years, there is some evidence that the fair market value was less than the amount of $100,000 alleged by respondent as the sales price. Pierce's memorandum suggests a value of $60,000, book value was slightly less than $70,000, and Myrl, Herman, and William all testified that the sale was for the price of $80,000. However, the question is not what was such value, but what Myrl in fact received under all the circumstances for selling his interest in the corporation. The alternative proposed by Myrl to the outright sale of his stock, the liquidation of the corporation, was repugnant to the very essence of the plan the stockholders had been contemplating for their retirement and the perpetuation of the corporation under their control. While Myrl alone could not force the corporation to liquidate, Herman and Minnich, because of their age and health, and their desire to retire immediately, were under pressure to accept Myrl's offer to sell his stock to achieve *111 their purposes. This pressure undoubtedly accounts in part for the total amount that Myrl was able to obtain for his stock from Herman and Minnich and the corporation. Finally, in the absence of any evidence of an established policy of granting pensions to retiring employees, we find it difficult to conclude that the corporation would begin such a policy with a stockholder who had refused to participate in the retirement plan favored by the majority of the stockholders. The fact that Samuel received a portion of the $19,999.78 is not of significance in light of his relationship to Myrl, who had provided him with funds before, and his much shorter employment with petitioner. Nor has petitioner elaborated on the services rendered by Samuel and their value. With respect to the "mutual promises" subsequent to the first two set forth in the contract, the corporate petitioner has failed to introduce any evidence indicating their value, or whether they were of mutual advantage to the corporation and to Myrl. Accordingly, they are not the basis for a deduction by the corporation. We have carefully considered the authorities cited by both parties, including the regulations and consistent interpretation *112 of the statute indicated therein relied on by the corporation, but do not find them determinative of the issue. The question of whether the amount involved is a reasonable allowance for retirement pay or in partial payment of Myrl's stock is one which must be determined upon the particular facts presented. We hold that the amount of $19,999.78 received by Myrl and Samuel was not a reasonable allowance as additional compensation for prior services rendered, nor a pension in recognition of such services, and is not deductible by the corporation as an ordinary and necessary business expense pursuant to section 162(a)(1). For the reasons already stated we also hold that Myrl realized on the sale of his stock the amount of $99,999.78, and that the $19,999.78 received by Myrl and Samuel constitutes a part of such amount, realized by Myrl in the years 1955 and 1956 when received by him and Samuel. Issue 2 The petitioners' only contention is that the stock was sold for $80,000, and that the amount of $19,999.78 paid pursuant to the contract of March 10, 1955, to Myrl and Samuel cannot, therefore, be a constructive dividend to petitioners, Herman and Minnich. The respondent contends that *113 the amount of $19,999.78 was paid to Myrl and Samuel in consideration of the sale of Myrl's stock to Herman and Minnich, and was, accordingly, paid for Herman's and Minnich's use and benefit, partially fulfilling what was primarily their obligation to pay Myrl $99,999.78 for his stock. Zipp v. Commissioner, 259 F. 2d 119 (C.A. 6, 1958), affirming 28 T.C. 314 (1957); Byers v. Commissioner, 199 F. 2d 273 (C.A. 8, 1952); Wall v. United States, 164 F. 2d 462 (C.A. 4, 1957). We agree with the respondent that the amount of $19,999.78 was paid by the corporation to enable the petitioners, Herman and Minnich, to acquire all of Myrl's stock for a total consideration of $99,999.78, and constitutes a dividend to them. According to section 316(a), "the term 'dividend' means any distribution of property made by a corporation to its shareholders" out of its earnings and profits; dividends are includible in gross income. Section 301(c)(1). Respondent does not contend that any property was distributed directly to Herman and Minnich, but argues, in effect, that the amount of $19,999.78 paid by the corporation to Myrl and Samuel should be treated as though it had been distributed by the corporation *114 to Herman and Minnich who used it for their own benefit, namely, to partially pay Myrl for the stock they were purchasing from him. Under our holding in the first issue, we found that, in fact, Myrl received (through the payments to Samuel in part) the entire amount of $19,999.78 for selling his stock to Herman and Minnich. That same holding is determinative of the issue here. The primary consideration for the payment by the corporation pursuant to the contract of March 10 was to obtain the transfer of Myrl's stock to Herman and Minnich. Herman and Minnich controlled the corporation and were able to direct that this payment be made by the corporation for their personal benefit. It is as though the corporation had distributed this amount to Herman and Minnich to enable them to buy Myrl's stock of the same value. Accordingly we hold that each of the petitioners received a "constructive" dividend in the amount of one-half of $19,999.78. Section 301(b)(1)(A). Zipp. v. Commissioner, supra. While it is probable that some other method or methods of securing the surrender of Myrl's interest in the corporation would not have resulted in a dividend to the petitioners Herman and Minnich or in *115 any net economic difference in their situation, taxability is more dependent upon what was done than what might have been done, and in the area of constructive dividends, the form of the transaction is of great significance. Woodworth v. Commissioner, 218 F. 2d 719 (C.A. 6, 1955); Thomas J. French, 26 T.C. 263 (1956). Here, the transaction took the form of a purchase of the stock by petitioners and the contract of March 10 was a part of that transaction, whereby corporate funds were expended to further that purpose. The decision of Tucker v. Commissioner, 226 F. 2d 177 (C.A. 8, 1955), reversing 23 T.C. 115 (1954), is distinguishable in that the Court of Appeals found that the benefit was primarily the corporation's, not the purchasing stockholder's. See John A. Decker, 32 T.C. 326 (1959), on appeal C.A. 6, November 27, 1959. We do not find that the payment in the instant case was to benefit the corporation rather than Herman and Minnich. The balance sheets attached to the corporation's returns disclose earnings in excess of the amount in question. Accordingly the amount of $19,999.78 is deemed to be out of the corporation's earnings and profits. Section 316(a). Because we have *116 found that the payment of the amount of $19,999.78 was in consideration of the transfer of Myrl's stock to Herman and Minnich, a payment directed by the controlling stockholders who benefited thereform, we need not decide the correctness of respondent's contention that "legal" obligations owing from Herman and Minnich to Myrl were satisfied by that payment, or rely for our decision on those cases holding that the satisfaction of such obligations constitutes a constructive dividend to the debtor stockholders. See Ferro v. Commissioner, 242 F.2d 838 (C.A. 3, 1957), affirming a memorandum opinion of this Court; Wall v. United States, supra, Schalk Chemical Co., 32 T.C. 879 (1959), on appeal C.A. 9, October 19, 1959. As respondent contends, the absence of a written obligation in no way affects the nature of the benefit received. Further, the statutory provisions for the taxation of corporate distributions in no way suggest that distributions made to stockholders to enable them to purchase property are less in the nature of dividends than distributions made to enable them to satisfy personal obligations. Section 301(a), (b) and (c); Section 316(a). We hold that the petitioners Herman *117 and Minnich received equally a constructive dividend in the amount of $19,999.78, in the years this amount was paid to Myrl and Samuel. Issue 3 The corporate petitioner contends that considering all the determinative factors, with proper emphasis on Herman's qualifications and many years of experience, the amounts paid to him were a "reasonable allowance for salaries * * * for personal services actually rendered" within the meaning of section 162(a)(1), [4] citing Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115 (C.A. 6, 1949); Miller Mfg. Co. v. Commissioner, 149 F. 2d 421 (C.A. 4, 1945); Smokey Mountains Beverage Co., 22 T.C. 1249 (1954). Respondent contends that the corporate petitioner has failed to prove that it is entitled to the deduction sought. Miller Mfg. Co. v. Commissioner, supra. With the exception of his determination for the year 1955, we agree with the respondent. The corporation's attempt to prove that Herman's services were of greater value than determined by respondent is faulty in several respects. We find it particularly difficult to believe that William was as unfamiliar with the duties of the office of secretary-treasurer and so in need of *118 Herman's counsel during the taxable years as the corporate petitioner contends. At the time of Herman's attack, William had had some six years of experience in Herman's office. From 1951 to January 1, 1954, Herman offered the corporation's officers such little advice that Minnich felt free to file the statement, under penalty of law with the Social Security Administration that Herman rendered no services. William had been the acting secretary-treasurer for approximately five years, with eleven years of experience for the corporation when Herman was sufficiently recovered to counsel him in carrying out the duties of that office early in 1954. Considering William's experience at that time, particularly as acting secretary-treasurer without the benefit of Herman's counsel for three years, the corporation has failed to prove that Herman's advice, although undoubtedly competent, was needed and of greater value to William and it than determined by respondent. The testimony respecting Herman's visits to the corporation's place of business was extremely vague; Herman himself, although a deponent in this case, did not testify as to the extent of his activities during the years in question. Herman's *119 experience, his counsel, and his undertaking of petitioner's buying after Myrl left, a service to the corporation even if not a usual duty of his office, Smokey Mountains Beverage Co., supra, and William's opinion of the reasonableness of his compensation, must be weighed against the factors supporting respondent's determination. The corporation's officers had for years been paid salaries in proportion to stockholdings; this practice continued in the years 1954 and 1955 and petitioner has not suggested that any change in policy occurred in 1956. Such a practice is indicative of the possibility of disguised distributions of profits, especially significant in a closely held corporation, such as the corporate petitioner, where there has been a complete failure to declare any dividends for many years. See East Coast Equipment Co., 21 T.C. 112 (1953); Wm. J. Lemp Brewing Co., 18 T.C. 586, 598 (1952); Gem Jewelry Co., 165 F. 2d 991 (C.A. 5, 1948), affirming a memorandum opinion of this Court; Astorian-Budget Publishing Co., 44 B.T.A. 969 (1941). While the corporate petitioner has proved that Herman had long experience with it, there was no evidence indicating that Herman had unusual *120 qualifications or ability which would make his counsel extraordinarily valuable. Nor was there testimony indicating that Herman was the dominant personality or directing head of the corporation. The lack of any extraordinary qualifications must be considered together with his greatly reduced capacity to render services because of his heart condition. See Astorian-Budget Publishing Co., supra; cf. Consolidated Apparel Co., 17 T.C. 1570 (1952), affd. on this issue, 207 F. 2d 580 (C.A. 7, 1953); General Smelting Co., 4 T.C. 313 (1944). The corporate petitioner has proved that Herman participated actively in buying for it after Myrl left in March 1955. There is no direct evidence that Herman was experienced in buying. However, Herman had been associated with the corporation for approximately 40 years, and we are convinced that his activities with respect to buying activities were of definite value to it. The extent to which Herman engaged in buying activities during the year 1955 is not known with exactitude; however, the amount of $5,000 for the year 1955 is a reasonable allowance for salary for this service along with his other activities on behalf of the corporation. We do not *121 understand the corporate petitioner to argue that any part of the compensation paid to Herman was in the nature of a pension for services rendered in prior years. Nor do the facts suggest any established policy on petitioner's part to pay any benefits to injured or ill employees. While Herman's activities increased to some extent as his health improved during 1955 and 1956, respondent has allowed greater deductions for those years. We have considered carefully the abovestated and other factors determinative of the issue. See J. Warren Leach, 21 T.C. 70, 77 (1953). With the exception of the year 1955, for which we find the amount of $5,000 to be reasonable, the respondent's determination of reasonable allowance for salary for services rendered by Herman for the years in question is sustained. Issue 4 The corporate petitioner's contention that it is entitled to deduct the unrecovered leasehold costs as of July 31, 1955, in that year cannot be sustained. It is true that generally a taxpayer may amortize leasehold improvements over the term of the lease where the improvements have a life not less than the length of that term. Fort Wharf Ice Co., 23 T.C. 202, 207 (1954). However, where, *122 before the lease expires, the lessee and landlord enter into a new lease covering the same premises, and the life of the improvements is not less than that of the term, the new term should be used as the period over which to amortize the unrecovered costs of the improvements. East Kauai Water Co., Ltd., 11 T.C. 1014 (1948). "It is immaterial that the original franchise did not contain an option of renewal or that it continued in full force until it expired. The petitioner by the acceptance of the new lease, obtained a longer period of time in which to use its properties and their remaining cost should be recovered over that longer period." East Kauai Water Co., Ltd., supra, at 1016. The corporate petitioner has introduced no evidence suggesting that this rule is not applicable here; accordingly, respondent's determination that the remaining costs should be amortized over the five-year term of the new lease is sustained. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Estate of C. B. Minnich (Deceased), Fred S. Minnich, Executor, Docket No. 72547; Estate of C. B. Minnich (Deceased) by Fred S. Minnich, Executor, Docket No. 72548; H. A. Glenn and Amy N. Glenn, Husband and Wife, Docket No. 72549; S. Myrl Glenn, Sr. and Clara J. Glenn, Husband and Wife, Docket No. 72550.↩
2. All references to sections are to the Internal Revenue Code of 1954.↩
*. Summarized from certain items set forth on the Schedule L balance sheets.↩
3. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered: Income Tax Regulations, Sec. 1.162-10. Certain Employee Benefits. - (a) In general. - * * * Amounts paid or accrued within the taxable year for dismissal wages, unemployment benefits, guaranteed annual wages, vacations, or a sickness, accident, hospitalization, medical expense, recreational, welfare, or similar benefit plan, are deductible under section 162(a) if they are ordinary and necessary expenses of the trade or business. * * * For similar language and as evidence of a long-standing interpretation by the respondent of this section, see Regs. 118, Sec. 39.23(a)-9, Regs. 111, Sec. 29.23(a)(9). However, for the restrictive aspects of that interpretation, see Income Tax Regulations, Sec. 1.162-7↩; Regs. 118, Sec. 39.23(a)-6; Regs. 111, Sec. 29.23(a)-6.
4. See footnote 3.↩