289 F.2d 644
 Ethel F. BAINS and Girard Trust Corn Exchange Bank, Trustees under the Will of Edward Bains, Deceased
v.
UNITED STATES.
Marian B. GODFREY and Girard Trust Corn Exchange Bank, Trustees under the Will of J. Lewis Godfrey, Deceased
v.
UNITED STATES.
Lydia C. BARGER and Bloomsburg Bank-Columbia Trust Company, Executor of the Estate of John P. Barger, Deceased
v.
UNITED STATES.
 No. 41-58.
 No. 42-58.
 No. 130-58.
 United States Court of Claims.
 May 3, 1961.
 Rehearing Denied July 19, 1961.
 
 Richard S. Doyle and Stanley Worth, Washington, D. C., for plaintiffs. Blair, Korner, Doyle & Worth, Washington, D. C., and Romeika, Fish & Scheckter, Philadelphia, Pa., and Jules G. Korner III, Washington, D. C., on the briefs.
 Earl L. Huntington, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, Washington, D. C., for defendant. James P. Garland and Lyle M. Turner, Washington, D. C., on the brief.
 MADDEN, Judge.
 
 
 1
 These three cases involve identical questions of fact and law. They are suits for the recovery of income taxes collected from the estates of Bains and Godfrey, and from Barger who died after the payment of the tax, and whose estate is suing for the refund of the tax which he paid. The three taxpayers each owned shares in a corporation which in 1950 redeemed a part of the shares of each of its shareholders, paying the shareholders a fixed price per share. The Government collected the taxes on these payments on the basis that they were fully taxable as dividends. The plaintiffs contend that, because of certain statutory provisions, the payments should have been given capital gains treatment, under which their taxes would have been substantially smaller.
 
 
 2
 The corporation in question was Bloomsburg Hosiery Mills, Inc., a Pennsylvania corporation. From at least as far back as 1925 the stock of the corporation had been owned, one-half by Edward Bains, one-fourth by J. Lewis Godfrey and one-fourth by John P. Barger. These three men were the officers and directors of the corporation. The corporation had been reasonably successful, had paid cash dividends quite regularly, and issued stock dividends on at least two occasions.
 
 
 3
 In September 1947 Mr. Godfrey died and his stock passed to a trust which had been created by his will. In February 1949, by a proportionate redemption of 100 shares of stock, which transaction is not in question here, the total number of shares was reduced to 2400, the proportionate ownership remaining as it had been. In July 1949 Edward Bains died, and his 1200 shares passed to a testamentary trust.
 
 
 4
 After the death of Mr. Bains, various proposals and counter proposals were made and considered by the stockholders. An attempt was made to interest an outsider in purchasing the Bains stock. The potential purchaser wanted to obtain a controlling interest in the corporation and the Godfrey and Barger interests were not agreeable to that. Although the discussions were on an amicable basis, the legal adviser of the Bains trust was prepared to recommend that the trust invoke the Pennsylvania Deadlock Statute and compel an involuntary dissolution of the corporation, if a plan for getting the Bains trust investment out of the corporation could not be agreed upon. This advisor was of the view that a trust which was to provide an income for Mr. Bains' widow should not have its funds tied up in a small corporation which would have new and untested management. Further, the Bains estate needed money to pay administration costs and estate taxes. The trustees of the Bains trust concluded that the trust should get its money out of the corporation.
 
 
 5
 For several months in late 1949 and early 1950, the Bains trust, two sons of the deceased Godfrey, and Barger, negotiated. The Godfrey and Barger interests were anxious to keep the corporation in business. In February 1950 all interested parties agreed upon a plan which, they thought, would fulfill the objectives of the several interests. The plan involved three steps: (1) The redemption and cancellation of one-third, i. e., 800 shares, of the outstanding stock of the corporation, at par value, i. e., $100 per share, pro rata among the three shareholders; (b) the sale of 400 of the Bains trust's remaining 800 shares to John L. Godfrey, Jr., Charles S. Godfrey, they being sons of the deceased John L. Godfrey, Mrs. Marian B. Godfrey, who was Mr. Godfrey's widow, and Harry T. Gunter, each of these four persons to buy 100 shares; (3) the further sale by the Bains trust of its last 400 shares, 100 each to the same four persons as soon as their financial resources would enable them to complete the purchase.
 
 
 6
 The plan agreed to in February 1950 was carried into effect substantially as agreed to. The corporation's charter was amended to reduce the amount of its authorized capital stock. The purchase option agreement which had existed between Bains, Godfrey and Barger was cancelled so that the Bains trust could sell its shares to the four new stockholders.
 
 
 7
 On June 1, 1950 step No. (1) was taken. The 800 shares were redeemed, surrendered and cancelled, and the three stockholders were paid $80,000. On June 29, Mrs. Godfrey, the two Godfrey sons, and Gunter each bought 100 shares of stock from the Bains trust. Thus step No. (2) of the February plan was taken practically contemporaneously with step No. (1). In 1952, by which time Mrs. Godfrey and the two sons had been able to reduce their indebtedness sufficiently to borrow the necessary money from the banks, each bought 100 more shares from the Bains trust. The last 100 Bains shares which Gunter was to have bought, were bought by the corporation, Gunter having sold his 100 shares bought on June 29, 1950, and having resigned his office in the corporation.
 
 
 8
 As we have said, the instant lawsuit is about the tax status of the $80,000 which was paid on June 1, 1950, $40,000 to the Bains trust, $20,000 to the Godfrey trust, and $20,000 to Mr. Barger.
 
 
 9
 The applicable statutory provisions are in section 115 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 115. Subsection (c) says that amounts distributed by a corporation in partial liquidation shall be treated as in part or full payment in exchange for the stock. If not qualified by other statutory provisions, that would mean that a stockholder's transferring his shares, or some of his shares, to the corporation, for redemption money, would be treated just as if he had sold his shares to an outside person for the same amount of money. He would have a capital gain, or loss, depending upon how much he had paid for the stock, and how much he received for it.[1]
 
 
 10
 But subsection (g) of section 115 qualifies what has been said above. It says:
 
 
 11
 "(g) Redemption of Stock. — If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend."
 
 
 12
 This question of "equivalence"[2] has been extensively litigated. The fact that some other court in a situation resembling our instant one in some respects, but differing from it in many other respects, has found equivalence or the lack of it, is not very helpful. In some of the decisions the courts have written a long or shorter list of the elements which they have regarded as helpful in reaching their conclusions. See, e. g., Earle v. Woodlaw, 9 Cir., 245 F.2d 119, 126; United States v. Fewell, 5 Cir., 255 F.2d 496, 500. However, as the courts have frequently said, the answer in each case must be arrived at on the basis of the particular facts of the transaction in question. McGuire v. Commissioner, 7 Cir., 84 F.2d 431, 432-433; Woodworth v. Commissioner, 6 Cir., 218 F.2d 719, 723; Smith v. United States, 130 F. Supp. 586, 131 Ct.Cl. 748, 756.
 
 
 13
 In considering the particular facts of the instant case, the important question is whether all of the facts flowing from the February 1950 agreement are relevant, or whether the June 1, 1950 redemption and payment is the only relevant fact. If the June 1 transaction alone is regarded, equivalence is obvious. The corporation has distributed $80,000 of accumulated earnings to its shareholders, pro rata. It has reduced the number of its shares from 2,400 to 1,600, but the Bains trust still owns one-half of the shares, the Godfrey trust one-fourth, and Barger one-fourth. The resemblance to the distribution of a dividend is quite perfect.
 
 
 14
 If, however, we look at the three steps which were agreed to in February 1950, of which the June 1 redemption was step No. (1), which step, we may assume, would not have been permitted by the Godfrey and Barger interests except for the Bains agreement to the other two steps, the resemblance to the distribution of a dividend disappears.
 
 
 15
 When the June 1 redemption occurred, it was certain, according to the agreement of the parties, that the Bains trust, instead of retaining one-half the stock and a negative controlling interest in the corporation, would shortly own one-fourth of the stock and be a minority stockholder. And it was equally agreed that, in due course, the Bains trust would have no interest whatever in the corporation; would be as completely eliminated as if it had sold its stock to an outsider. The controlling interest would be in the Godfrey trust and the Godfrey individuals; the Godfrey sons would have the management of the corporation.
 
 
 16
 If then, we look at the June 1 redemption as a part of an agreed series of steps, which steps were carried through as planned, with one minor variance, the redemption no longer looks like a peaceful process of getting accumulated earnings into the hands of the stockholders on a pro rata basis. It looks, rather, like the beginning of a revolution in the affairs and status of the corporation, which when the revolution is complete, will mean that the corporation has largely new owners and entirely new management.
 
 
 17
 In the case of Smith v. United States, 130 F.Supp. 586, 131 Ct.Cl. 748, this court held, in a case somewhat comparable to the instant one, that the distribution there in question was not equivalent to a taxable dividend. In Atlantic City Electric Co. v. United States, 161 F.Supp. 811, 142 Ct.Cl. 519, and Idaho Power Co. v. United States, 161 F.Supp. 807, 142 Ct.Cl. 534, we held, under another statute raising a similar problem, that the distributions there involved were not equivalent to dividends. In the instant case we conclude that, considering the transaction as a whole, there is not the equivalence at which section 115(g) is directed. Section 115(c) accords capital gains treatment to amounts distributed in partial liquidation, and section 115(g) is in the nature of an exception to the generalization. We see no reason why the exception should be given an expansive interpretation, resulting in the finding of equivalence where it is not fairly apparent.
 
 
 18
 The plaintiffs are entitled to recover, with interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S. C.A.
 
 
 19
 It is so ordered.
 
 
 20
 JONES, Chief Judge, and DURFEE, LARAMORE and WHITAKER, Judges, concur.
 
 
 
 Notes:
 
 
 [1]
 See the quotation, in White v. United States, 305 U.S. 281, at page 290, 59 S.Ct. 179, 83 L.Ed. 172, from the reports of the Congressional Committees on section 201 of the Revenue Act of 1924, which contained the provision later embodied in section 115(c), applicable in this case
 
 
 [2]
 See Stein v. United States, 62 F.Supp. 568, 104 Ct.Cl. 446, 455